# McCAULEY v. WELLER et al.

Terry, C. J.—The exhibition by a Judge of partisan feeling, or the unnecessary expression of an opinion upon the justice or merits of a controversy, though exceedingly indecorous, improper and reprehensible, as calculated to throw suspicion upon the judgments of the Court, and bring the administration of justice into contempt, are not, under our statute, sufficient to authorize a change of venue on the ground that the Judge is disqualified from sitting. The law establishes a different rule for determining the qualification of Judges from that applied to jurors.

The province of a Judge is to decide such questions of law as may arise in the progress of the trial. His decisions upon these points are not final; and if erroneous, the party has his remedy by bill of exceptions and appeal. *Ib.*

Whilst, on the other hand, the province of the jury is, to determine from the evidence the issues of fact presented by the parties; and their decision is final in all cases where there is a conflict of testimony. *Ib.*

The action of forcible entry and detainer is a summary proceeding to recover possession of premises forcibly or unlawfully detained. The inquiry in such cases is confined to the actual peaceable possession of the plaintiff, and the unlawful or forcible ouster or detention by defendant—the object of the law being to prevent the disturbance of the public peace, by the forcible assertion of a private right. Question of title or right of possession cannot arise; a forcible entry upon the actual possession of plaintiff being proven, he would be entitled to restitution, though the fee simple, title and present right of possession is shown to be in the defendant. *Ib.*

Where the Governor of the State, who is authorized, and it is made his duty by law, to take immediate possession of the State prison and grounds, then in the possession of a lessee of the State, goes, in company with other officers of State, upon the grounds of the prison, and demands of the person in charge the keys of the prison, which being refused, the door of the room in which the keys were, was forced by order of the Governor, and the keys taken, and thus the possession of the prison and grounds taken by the Governor in the name and on behalf of the State: *Held,* That such acts amounted to a forcible entry on the part of the Governor, and he is personally liable therefor. Further *held,* that the acts of the Governor warranted the conclusion that any attempt on the part of the lessee to resume possession of the prison, would be resisted by force. *Ib.*

Although the State possesses the constitutional power to take private property for public purposes, by providing just compensation therefor, yet, the means of compensating the owner must be provided before the property is taken. *Ib.*

The Act of February the twenty-sixth, 1858, under which the Governor justified the taking, made no provision for compensation, and is therefore clearly in violation of the eighth section of Article I of the Constitution of this State. *Ib.*

Field, J.—The validity of the lease under which the lessee held the premises, cannot be tried in this action, nor can the lessee be deprived of the advantages resulting from the possession of the premises under the lease, by a forcible ouster under legislative enactment.

McCauley *v.* Weller.

Assuming the lease to have been valid—there was in the plaintiff a property of which he could not be divested for public use without just compensation. His right, so far as the land and buildings were concerned, was in no respect affected by the fact that they were designed as a place for the confinement of convicts. The purposes for which premises are leased cannot alter the nature of the leasehold interest as property. To take such property without compensation is beyond the reach of legislative power. Such compensation must be made, or a fund provided from which it can be made in advance. So strictly is this rule adhered to, that the enforcement of any statute to take such property, where the indemnity has not been provided, will be stayed by injunction. *Ib.*

An Act of the Legislature appropriating private property, without providing compensation, is unconstitutional and void. It may not be absolutely essential that the compensation should be provided in the same Act which authorizes the seizure, but it is essential that it should be provided before the seizure can be enforced or justified. *Ib.*

The Governor cannot rest his justification in taking the premises upon any possible forfeiture of the lease under which plaintiff held. Such forfeiture cannot be asserted except by force of a judicial determination. The Legislature cannot take upon itself, nor the officers of government upon themselves, to adjudge what right has accrued to the State, and then proceed to enforce it, any more than a private citizen. *Ib.*

APPEAL from the County Court of the County of Marin.

This was an action of forcible entry and unlawful detainer. The action was originally commenced in a Justice's Court, where the cause was tried by a jury, and a verdict of "not guilty" returned: upon which judgment was entered for the defendants. The plaintiff appealed therefrom to the County Court of Marin, where the cause was tried anew.

The plaintiff alleges in his complaint, that on the first of March, A. D. 1858, he was in the actual, peaceable and lawful possession of the messuage, lands, and tenements, situate in said township, and known as the " State prison " premises, at Point de San Quentin, and had been in possession thereof for a long time prior thereto.

That on the first of March, aforesaid, John B. Weller, Joseph Walkup, and Ferris Forman, with strong hand and multitude of people, and not in a peaceable manner, and without right of entry given by law, entered by force, and dispossessed him of said premises, etc., and detained the same. And that the value of the premises, from the time of entry, was not less than five thousand dollars per month.

McCauley *v.* Weller.

The defendant Weller, (who was then the Governor of the State) in answer to the complaint, denied the actual possession of the plaintiff, and the forcible entry.   He further stated that the premises sued for belonged to the State of California, and had been kept and used by said State, through her agents, as a public prison, or penitentiary, for the confinement of persons adjudged guilty of felony.

That, according to his information, one J. M. Estill took charge of said prison in March, 1856, claiming under a contract between himself and R. M. Anderson, (then Lieutenant Governor of said State) G. W. Whitman, Controller, and Henry Bates, State Treasurer, and that plaintiff claimed to be in possession, by his agents, by virtue of an assignment of said contract to him by Estill.

That, on the first day of March, A. D. 1858, acting by authority of an Act entitled " An Act to provide for the temporary government of the State prison, and to appropriate money therefor," approved February twenty-sixth, 1858, he, without resorting to force, took possession of said premises, and held possession until the first of May, when he, Walkup and Forman, took possession, as Commissioners, under the provisions of an Act approved April twenty-fourth, 1858, and had retained the same up to that time.

The Act of February the twenty-sixth, under which the Governor acted, reads as follows :

" SECTION 1. The Governor of this State is hereby authorized and empowered, and it shall be his duty, by and through such agent or agents as he may, in his discretion, appoint, to take immediate possession of the State prison and grounds, together with all the property of the State therein situated, and to assume the custody, control, and management of the State prison convicts therein confined, or to be therein confined, and thereafter to continue the possession of the property aforesaid, and control of said convicts, until further provided by law," etc.

Walkup and Forman answered separately, denying all the allegations of the complaint, except their possession, and justifying that possession under the Act of twenty-fourth April, referred to in Weller's answer.

The defendants moved the County Court for a change of venue, on the ground of prejudice of the presiding Judge, and based their appli-

McCauley *v.* Weller.

cation upon the affidavits of Lieut. Governor Walkup, Col. F. Forman and W. J. Mackay.

Walkup and Forman both testified that they did not believe the defendants could have a fair and impartial trial in that Court, (or County,) on account of the bias of the presiding Judge, R. B. Frink; that said Frink was present during the trial before Justice Clark, took a deep interest in the plaintiff's success, and was in frequent consultation with plaintiff's agent and attorneys, in regard to the cause, giving advice in reference thereto.    Walkup further stated that said Frink was a material witness for the defense.

Mackay, who was not a party to the suit, also testified to the same facts stated by Walkup and Forman, and stated that said Judge was expressing himself so strongly in favor of plaintiff that bystanders, on more th◼n one occasion, told him he was doing wrong to take so deep an interest in the case, as it would probably come before him.

The motion was overruled and defendants excepted.    Plaintiff had judgment in the Court below for the restitution of the premises, and a personal judgment against John B. Weller, for the sum of twelve thousand two hundred and forty-nine dollars and ninety-three cents; and also the further sum of $282 costs.    Walkup and Forman were discharged.    Defendant Weller appealed to this Court.

*Thompson & Williams* for Appellant.

*First*—The order refusing a change of venue.

The first prerequisite which strikes us as all-important in the administration of justice, is, that the Judges must be free from bias and partiality, both positive and constructive.

A Judge cannot, under the law, be both arbiter and advocate in the same cause ; neither should he be both arbiter and counsellor.    Mankind are so agreed in this sentiment, that any departure therefrom not only shocks their sense of justice, but of propriety also.

The twenty-first section of the Practice Act declares that the Court may, on motion, change the place of trial, " when there is reason to believe that an impartial trial can not be had therein," (the County) and " when, from any cause, the Judge is disqualified from acting in the action."

I am inclined to think, that under either of these subdivisions of the sections quoted, this motion might have been granted. " When, from any cause, he is disqualified," says the statute.

Now, does this mean a mere statutory disqualification ? or does it go further, and embrace all disabilities which would preclude or pervert the administration of justice ? A common sense construction would seem to imply the latter.

It has been the constant practice in this State to grant changes of venue upon the same grounds on which this application was based. If I am wrong in my view as to the power of the Courts to grant the change for this cause, then all such changes have been illegal, because the statute (sections eighteen and nineteen of Practice Act) expressly fixes the place of trial, subject only to be changed as provided in that Act, and no Judge can hereafter make such an order without the express consent of all the parties to the action, as he can not seek authority outside of the statute.

I cannot imagine a more unpleasant position in which to place a high-toned, honorable, and sensitive Judge, than to have such a motion as this under discussion, made, and then, by the refusal of consent thereto by the opposite party, to render him powerless to grant it. Nor can I imagine a more dangerous position for the litigant, than to drag him into a Court and compel him to submit his cause to a Judge who has already determined to pronounce against him.

Up to this point of time, I have been merely contending for the power in the Court to grant the change which we sought. If the power is proven or admitted, then it is necessary that we show by the facts that this was a proper case for the exercise of the discretion of the Court, favorable to us, and that the failure to do so was gross abuse of such discretion.

If we are able to make such showing, then it is clear that we are entitled to a reversal of the judgment upon the first assignment of error. Sloan *v.* Smith, 3 Cal. 410 ; Comminsky *v.* White, January Term, 1855 ; The People *v.* Lee, 5 Cal. 353.

1st. That, admitting the contract as valid, the State had a perfect right, at any time, to rescind, violate, or annul it, without the assent of the lessee or his assigns.

2d. That the title of the premises being in the State, she had a right to take possession of the same by her officers, with or without force.

3d. That the entry complained of was not forcible.

4th. That, considering the premises sued for the private property of the plaintiff for the time being, the State had a right to take the same for public purposes, by providing just compensation therefor, and that such compensation was provided.

I. It is an admitted proposition by all, that the Legislature is omnipotent, and " that its power and jurisdiction is so transcendental and absolute, that it can not be controlled or confined, either for person or cause, within any bounds," except so far as it may be restrained by constitutional prohibitions.

Tha nahere is no constitutional prohibition applicable to this case, which would have prevented action by the Legislature, was settled by this Court in Myers *v.* English, 9 Cal. 341.

After an able review, both upon that and a former occasion, of the authorities cited in support of an adverse position, Justice BURNETT— C. J. TERRY concurring—concludes with this remark : " Under the view we take, we still adhere to the position stated in the former opinion. That provision of the Constitution refers to contracts between individuals. It could not refer to contracts between individuals and the State, because the State cannot be sued." '

This was upon a rehearing, and consequently this opinion expresses the conviction of the Court, after great deliberation. I shall not, therefore, present authorities to sustain the decision, for it needs none, nor will I review those cited by the other side, and claimed to be repugnant to it.

For legislative precedent, I refer the Court to the past legislation in this State in reference to State prison affairs. In 1851, (Statute '51, 427) M. G. Vallejo and James M. Estill were made lessees of. the prison for ten years. At the next session, Estill was constituted sole lessee (Stat. '52, 134) ; and again, in 1855, this Act was repealed, and the prison placed under the government and control of a Board of Directors. (Stat. '55, 292, 296.) In 1852, the Board of Commissioners made a contract with F. Vassault, (*alias* J. M. Estill)

32

under the Act of May 1, '52, (Stat. '52, 132) for the erection of a State prison ; and in the following year the Legislature passed an Act, (Stat. '53, 157) declaring said contract null and void ; and during the same session (p. 312) instructed the Controller not to issue warrants on account of such contract, until otherwise directed. The Board of Directors of 1855, and the contracts made by them, were subsequently disposed of in the summary manner which the practice I have detailed warranted ; and when Estill took this last contract, he well understood the construction which the Legislature placed upon its power to rescind the same at pleasure.

II.   The answer of the defendant Weller sets up title to the premises sued for in the State, and charges the entry to have been by virtue of a law directing it.   The evidence clearly sustains the allegation of title.   The plaintiff, in making out his case, proved this by the introduction of the contract, showing that he claimed under the State.

The title being in the State, I claim for her the right, by her officers or agents, to enter and take possession, at any time, without applying to the Courts, as in case of individuals ; whilst the learned counsel for plaintiff holds that she should have resorted to an action of ejectment.   In England, the right of the Crown to land is usually asserted in one of two ways ; by inquest of office, where the evidence of title is not in the Crown, and by taking possession without action, when it is.   In no event is there a resort to the action of ejectment.   "The King, though the chief and head of the kingdom, may redress any injuries which he may receive from his subjects by such usual common law actions as are consistent with the royal prerogative and dignity."

"But the more effectual means of asserting the rights of the Crown, and redressing its injuries, are those which are obtained by the prerogative modes of process.   Such is that by inquisition or inquest of office ; which is an inquiry made by the King's officer, his sheriff, coroner, or escheator, *virtute officii ;* or by writ sent to them for that purpose, or by commissioners specially appointed, concerning any matter that entitles the King to the possession of land or tenements, goods or chattels.   This is done by a jury of no determinate number, being

McCauley *v.* Weller.

either twelve, or less, or more." "Stamford lays it down, that in all cases where a subject shall not have possession in deed or in law, without entry, the King will not be entitled without office found or matter of record." As, "if the King claims upon a forfeiture;" "the lands of an idiot, lunatic, etc., etc.;" "the year, day, and waste, of a felon attainted;" "or the temporalities of a Bishop, for contempt."

"These inquests of office were devised by law as an authentic means to give the King his right by solemn matter of record; without which he in general can neither take nor .part from anything." Bacon's Abridgment, vol. 8, pp. 98, 99, title Prerogative.

"But no office is necessary, if the King's title appear as matter of record." "So, if a possession in law be cast upon the King, no office is necessary, but the King may seize without it." "So, when he ought to have chattels or profits of lands for a contempt, he may seize without office. And by Statute 33 H. 8, in case of attainder for high treason, the King shall have the forfeiture instantly without inquisition of office." Same book, 100.

I cannot more forcibly state the rule which prevails in the United States, than to quote from a pamphlet prepared by that great statesman and sound jurist, Thomas Jefferson, in 1810, entitled "The Proceedings of the Government of the United States in maintaining the Public Right to the Beach of the Mississippi, adjacent to New Orleans, against the intrusion of Edward Livingston: Prepared for the use of counsel, by Thomas Jefferson."

He says: "But I believe that no nation has ever yet restrained itself in the exercise of this natural right of reseizing its own possessions, or bound up its hands in the manacles and cavils of litigation. It takes possession of its own at short hand, and gives to the private claimant a specified mode of preferring his claim. There are cases of particular circumstance, where the Sovereign, as by the English law, must institute a previous inquest; but, in general, as the present, he enters at once on what belongs to his nation. This is the law of England.

"Whenever the King's (*i. e.* the nation's) title appears of record, or a possession in law be cast upon him by descent, escheat, etc., he may enter without an office found; for if his title appear any way of record,

it is as good as if it were found by office; and if any one enter on him, even before his entry made, he is an intruder; he cannot gain any freehold in the land, nor does he put the King to an assize, or ejectment, or take away his right of entry; for he can not be disseized but by record. Stamford *Prærogativa Regis*, 56, 57; *Com. Dig. Prærog.*, D. 71—the substance of the authorities cited.    *    *    *
We have before us, too, the example of many of the States, and of the General Government itself, which have never hesitated to remove, by force, the squatters and intruders on the public lands. Indeed, if the nation were put to action against every squatter, for the recovery of their lands, we should have only lawsuits, not lands, for sale.  *  *  *
The correct doctrine is, that so long as the nation holds lands in its own possession, so long they are under the jurisdiction of no Court, but by special provision. The United States cannot be sued. The nation, by its immediate representatives, administers justice itself to all who have claims on its public property; hence the numerous petitions which occupy so much of every session of Congress, in cases which have not been confided to the Courts. But, when once they have granted the lands to individuals, then the jurisdiction of the Courts over them commences. They fall into the common mass of matter justiciable before the Courts. If the public has granted lands to B, which were. the legal property of A, A may bring his action against B, and the Courts are competent to do him justice. The moment B attempts to take possession of A's lands, the writ of forcible entry, the action of trespass, or ejectment, and the chancery process, furnish him a choice of remedies. The holders of property, therefore, are safe against individuals, by the law; and they are safe against the nation by its own justice; and all the alarm which some have endeavored to excite, on this subject, has been mere *ad captandum populum.*"

The practice of the General Government has, since a very early day, been in accordance with the views expressed by Mr. Jefferson, in the quotations above made.

On the third of March, 1807, Congress passed " an Act to prevent settlements being made on lands ceded to the United States, until authorized by law." (U. S. Statutes at Large, vol. 2, p. 445.) By the terms of this Act, the President was authorized to cause the United

States Marshal, of the proper district, to remove all intruders upon ceded lands, including those who had settled or entered thereon before the cession, as well as those subsequently.

Afterwards, in 1821, the Secretary of War having referred the question of the power of the President, under this Act, to Mr. Wirt, then Attorney General, the latter unhesitatingly announced, as his opinion, that such intruders might be removed by military force, if necessary.   Opinions of the Attorney-General, vol. 1, p. 471.

And again, in that year, the same officer, in answer to a communication addressed him by the Secretary of the Treasury, said : "I have no doubt that the Marshal, under the orders of the President, may remove the intruders on the lands set apart for the cultivation of the vine and olive, in Mississippi.   The instructions to the Marshal must proceed from the President."   *Ibid*, p. 475.   As late as 1837, Mr. B. F. Butler, an able lawyer, and then Attorney General, gave to the President the opinion that the latter might expel, by force, if necessary, intruders upon the lands secured to the Chickasaws, east of the Mississippi.   *Ibid*, vol. 3, p. 255.

That the State may take possession of property, without inquest of office, or a proceeding in Courts of law, when authorized by statute, is admitted in the following cases :   Fire Department of New York *v.* Kiss, 10 Wend. 266 ; Fairfax's Devisee *v.* Hunter's Lessee, 7 Cranch. 622 ; Craig *v.* Radford, 3 Wheat. 599.

One of the reasons forming the basis of the doctrine I have been advocating, is, that the State (the Sovereign) cannot be disseized, and, therefore, cannot resort to the remedy of ejectment.   Blackstone, vol. 3, p. 257, chap. 17, in discussing the methods of redressing such injuries as the Crown may receive from the subject, says : " As, therefore, the King, by his legal ubiquity, cannot be disseized, or dispossessed, of real property, which is once vested in him, he can maintain no action which supposes a dispossession of the plaintiff ; such as an assize, or an ejectment."

The same doctrine has been held in this country as applicable to a State.

In The State *v.* Arledge and Gaither, 1 Bailey S. C. Rep. 552, Justice Johnson says : " It is very clear that in England the King

cannot maintain an ejectment to recover lands, and the reason given by Blackstone is, that on account of his legal ubiquity he cannot be disseized or dispossessed. All the elementary writers hold the same doctrine ; and it is even more strikingly applicable here, where the sovereign power and right are in the hands of the people themselves, who want that personal identity on which a disseizin could operate ; and for the further reason that a part of it abides in the defendants themselves."

The defendant, acting as Governor of the State, took possession of the premises in question, under and by virtue of an Act of the Legislature, approved twenty-sixth February, 1858, entitled "an Act to provide for the temporary government of the State prison, and to appropriate money therefor." It not only authorized the entry, but required it to be immediate. The Legislature did not design that he should resort to the slow processes of the Courts ; but, in the exercise of their sovereign power, instructed him to take possession of property, the title to which was unquestionably in the State, and to do so (borrowing Mr. Jefferson's expression) at *short hand.* If there is force in precedent and authority, the Legislature did not exceed its constitutional privilege and power in passing this Act, and the Executive would have been derelict in duty had he not enforced it. *Salus populi, suprema lex est,* is a maxim not to be ignored for trivial causes.

The Executive having acted by authority of law, and having in no way exceeded the limits of that authority, is protected from all consequences resulting therefrom. This is sustained by an abundance of authority, of which I will only cite—7 Howard U. S. 130 ; 4 Term R. 794 ; 6 Taunton, 41 ; 2 B. & C., 227 ; 2 Johns. 286 ; 7 Ohio, 211, part II.

III.   If the plaintiff failed upon the trial to prove actual force in the entry of the defendant, we are entitled to judgment, although every other point in the case may be with him. Wood's Digest, 467.

" To sustain the action of forcible entry, actual force, threats, or violence in the entry, or the just apprehension of violence to the person, must be shown to have existed. To constitute a forcible entry, the following rule is laid down in Tomlinson's Law Dictionary, which has been referred to in most of the Courts of the different States of

McCauley *v.* Weller.

the Union : ' A forcible entry is only such an entry as is made with a strong hand and unusual weapons, an unusual number of servants or attendants, or with menace of life or limb ; for an entry which only amounts in law to trespass, is not within the statute.' " Frazier and Hastler *v.* Hanlon, 5 Cal. 157.   The same view is taken in Williams *v.* Warren, 17 Wend. 261—264 ; and in Addison, 17.

The whole affair was conducted in an orderly, good-humored manner, and there was neither violence nor threats of violence.   None were necessary.   But on the contrary, plaintiff and his agent seem to have afforded every facility to the Governor in the discharge of the duty imposed upon him by the Act ; contenting themselves, as expressed in plaintiff's letter, with entering a protest.

They had ample means of resistance, if they had seen proper to resort to them ; but such was not plaintiff's intention. It suited his purposes to permit the entry, at the same time saving his legal rights.

In Pennsylvania *v.* Waddle, Addison, 41, the Court uses this language :  " If there was no force, he cannot be guilty.   Words are the slightest symptoms of force.   If you think it was the meaning and tendency of the words to impress on Johnson a terror of personal harm, if he should proceed to take possession—this is force.   If you think their meaning was only to signify that Waddle would not give up his claim, which he thought a just one, till at legal trial it was declared unjust—this is no force."

IV.   Admitting these premises to be the private property of plaintiff, still the State had the constitutional power to take it for public purposes, by providing just compensation therefor.   And it is immaterial whether the compensation was provided in the Act directing the seizure of the property, or by subsequent Act.

The only difference being that the plaintiff might have enjoined the taking, until the compensation was made, or sufficiently provided.   (1 Baldwin C. C. R. 226, 227 ; 1 Kernan, 308, and authorities there cited.)   In this last case, the Court says :  " Where private property is taken for public use, it is sufficient that a certain and adequate remedy should be provided, by which the individual can obtain compensation, without any unreasonable delay."

The Legislature did, by a subsequent Act, (twenty-sixth April, 1858)

make provision for just and ample compensation to plaintiff, for the property (if it may be so called) taken by the Governor, on the first of March preceding.  By that Act, (Statutes 1858, 339) a commission was organized, with power to examine the claims of plaintiff, and his assignor, and to award them such sum as they were justly entitled to.

The large sum of seventy-five thousand dollars was appropriated for the purposes of the Act, and the Commissioners were authorized to pay the same, or any part thereof, to said parties, upon final settlement.

The rule of law in such cases is, that the damages may be assessed in an equitable and fair mode, to be provided by law, without the intervention of a jury.  (2 Kent's Com., note *b* to page 339, top.)  And whenever the mode of ascertaining and assessing the compensation is fixed by statute, then that mode alone must be pursued.   1 Bald. C. C. 205, 221, 222 ; 4 Term R. 796 ; 7 Ohio, 568 ; 2 Kent, 339.

*A. P. Crittenden* for Respondent.

The question suggested by the Court for argument is, " Whether the State can, under any circumstances, without action, take possession of its own property, which is in possession of another ?

It is contended by appellant's counsel, that under any circumstances, whenever the title to the land is vested in the State, no action is required on the part of the State to recover possession against one holding adversely, but the State " has the right, by her officers and agents, to enter and take possession at any time, without applying to the Courts."

This is a startling proposition, at war with all received ideas of individual right, and utterly subversive of that security in the enjoyment of property which is supposed to exist under every free or constitutional government.   Yet it is a proposition which the appellant must maintain in its broadest extent, or he is without protection for the act of which we complain.

He rests it, 1st. Upon the right of the English Crown ; 2d. Upon the practice of the Government of the United States.

1st. As to the right of the English Crown.   It is said by the appellant's counsel that " in England the right of the Crown to land is

McCauley v. Weller.

usually asserted in one or two ways—by inquest of office, where the evidence of title is not in the Crown, and by taking possession without action, when it is."

It might well be contended that if the Crown of England did possess this extraordinary right of taking possession without action, it was only a prerogative right which could not exist here. But it is unnecessary to raise any question upon this point. Such a right never existed in the Crown of England in the terms and to the extent claimed.

" In England the King can neither take nor part with anything but by matter of record ; by conveyance upon record, judgment, or by office." (8 Bacon's Abr. 99 ; Comyn's Dig. Prerogative, D. 66.) " It is true, that when once the title is vested in him by matter of record, he cannot be disseized or dispossessed, but if any one enters he will be an intruder upon the King's possession, for he can only be ousted by matter of record. And therefore it is that the King can maintain no action which supposes a dispossession of the plaintiff, such as an assize or ejectment," (3 Bl. Com. 257 ; Comyn's Dig. Prerogative, D. 71) and as no laches can be imputed to him, and he cannot be disseized by the entry of another, his right is never defeated by any limitation or length of time.

But because when title was once vested in the King by matter of record, his seizin continues, notwithstanding the entry of another ; and because he cannot maintain an assize or ejectment, it by no means follows either that he cannot maintain any other appropriate action, or that he has the right by force, and without action, to remove an intruder. On the contrary, he may maintain any other action, (Comyn's Dig. Action, B. 1) and a special and peculiar action is given against one who enters upon the lands of the Crown. " If a man intrudes upon the King's lands, an information for the intrusion lies in the name of the Attorney General," (Comyn's Dig. Prerogative, D. 47 ; 8 Bacon's Abr. 101) and " judgment for the King shall be, that the defendant be removed from the possession, and there shall be an injunction for the possession, for the King is supposed in possession," (Comyn's Dig. Prerogative, D. 77) and " thereupon every party to the information, or claiming under him, shall be removed from the possession." 8 Bacon's Abr. 102.

This information of intrusion is a substitute for the action of eject-ment, and accomplishes the same purpose.    Why should it be resorted to, if its only end—the removal of an intruder—can be as effectually attained, without action, by the mere exercise of the inherent power of the Crown ?    That such an action exists, and should have been so often used as it appears to have been, (Comyn's Dig. Prerogative, D. 73 to 77) are forcible arguments against the right to exercise the power claimed for the Crown by the appellant's counsel.

The same term, to SEIZE, is used as well in speaking of the right of entry of the subject as of the Crown.

" So, an office is sufficient for the King without a *scire facias* against the party, where a common person may enter or SEIZE, without action." (9 Co. 96.)    " But where a common person cannot enter or seize, without having an action, the King, after office, ought to have a *scire facias.*"

The inquest of office was not a proceeding by which the King was put into actual possession of land, and an adverse claimant removed, but a mere inquiry as to the right.    Its object was to determine whether the King was entitled to the possession of property, as to inquire " whether the King's tenant for life died seized, whereby the rever-sion accrues to the King."    3 Bl. Com. 258.

The inquest of office was a public proceeding, a trial by jury, whose finding was not conclusive, but was traversable, and might be reviewed. (8 Bacon's Abr. 99 ; 3 Bl. Com. 360.)    So far from its giving any countenance to the idea that the King could himself determine upon his own right, and invade the possession of the subject, it was intended for the protection of the subject against the asserssion and exercise of arbitrary power.    In speaking of this proceeding, it is declared to be " a part of the liberties of England, and greatly for the safety of the subject, that the King may not enter upon, nor seize any man's pos-sessions, upon bare surmises, without the intervention of a jury."    8 Bacon's Abr. 99 ; 3 Bl. Com. 259.

The effect of the office, if found for the Crown, was to show title and right of possession in the King, by matter of record, and by the office only the King was in possession, without seizure, (that is, with-out entry) if the possession was vacant, but not otherwise.    8 Bacon's

McCauley *v.* Weller.

Abr. 100; Comyn's Dig. Prerogative, D. 68; Com. Dig. Prerogative, D. 69; 8 Bacon's Abr. 100.

It is apparent that the office does nothing more than a deed or other matter of record. It ascertains the right and vests the title in the King. The legal seizin and possession accompanies the title if at the time of the office the land be vacant—that is, if there be no adverse possession. But the question is still undecided, what may the King do if one enters upon his possession? The answer may be found in Comyn's Dig. Prerogative, D. 71 to 77. It is there asked how he shall be redressed in such a case? and the answer is, by information of intrusion.

It may be very clearly shown, that if the case now before this Court had arisen in England, the King could not have done what has been attempted under an alleged authority from the Legislature of this State, and if that be shown, it is sufficient for the purposes of this argument.

The King leases land for a term of years by deed recorded; he parts with the possession, and delivers it to his lessee to be held under the deed of lease. Without office found, without any judicial proceeding to declare a forfeiture, he forcibly resumes the possession. 8 Bacon's Abr. 98; Comyn's Dig. Prerogative, D. 67.

Now " an entry can only be made by the legal owner when another person, who hath no right, hath previously taken possession of lands or tenements." 3 Bl. Com. 174. But in this case the tenant entered and held by right, and his landlord, if a private person, certainly cannot legally enter upon the land during the continuance of the term. Adams on Ejectment, 157. In such a case, therefore, the King could not be entitled without office found.

The power of the Crown is hardly so despotic in England as we must believe it, if it be true that without process of law, without inquiry or trial, the King may seize whatever property he may adjudge to be his own. It was declared by *Magna Charta* that " no freeman shall be disseized or divested of his freehold, or of his liberties, or free customs, but by the judgments of his peers or by the law of the land. And by a variety of ancient statutes it is enacted, that no man's lands or goods shall be seized into the King's hands, against the

great charter and the law of the land.   (3 Bl. Com. 139, and by stat-
ute 16, Charles I., c. 10.)   That neither His Majesty or Privy Council,
have any jurisdiction, power or authority, by English bill, petition,
articles, libel, or by any other arbitrary way whatsoever, to examine or
to draw into question, determine or dispose of the lands or goods of
any subjects of this kingdom; but that the same ought to be tried
and determined in the ordinary courts of justice, and by course of
law." *Ib.*

When it is said that the King cannot be disseized, it is only intended
that notwithstanding the intrusion of one without right, the legal seizin
of the King shall in contemplation of law continue, and that none of
the consequences of an ouster shall follow as in the case of a subject;
that is, that the intruder can gain no freehold in the land; and cannot
make a lease to maintain an ejectment; that the death of the intruder
and descent cast on his heir, give no better right than his ances-
tor had, etc., and this is the reason why the King cannot maintain
an ejectment or assize.   Those actions admit what the law says can
never take place—a disseizin—and therefore, as a substitute, the inform-
ation of intrusion must be resorted to.

In both these particulars, the impossibility of a disseizin, and the
consequent impropriety of an ejectment, our law differs from that of
England.

The State of California may be disseized.   Ten years adverse pos-
session will constitute a title as against the State.   Within that time
it may maintain any action for the recovery of real property which an
individual might do.   Act of Limitations, secs. 3. 4, 5.

But even if the power of the King of England were all that it is
claimed to be by the appellant's counsel, and the right of the Crown
might be asserted by taking possession of land without action under
certain circumstances, it is clear, from the authorities above cited, that
it could never have done so in a case like the present.   It was a power
which could only be exerted against one who held possession without
right or color of right, a mere intruder, never certainly against one
who held by right derived from the Crown by matter of record.   It is
certainly requisite to the exercise of such a power that the King should
have the right of entry; and where the Crown has leased, or parted

with the possession by matter of record, the right of entry is gone, and can only be restored by office found or other proceedings of record.

In support of some of the positions assumed above, I would refer the Court to the argument of counsel and opinion of the Court in the case of the People of the State of New York *v.* Brown and others, 1 Caine's R. 416.

2nd. The practice of the Government of the United States.

It is true, that on the third of March, 1807, Congress passed an "Act to prevent settlements being made on lands ceded to the United States, until authorized by law." Probably the first occasion on which the power given to the President was ever employed, was in the case of the New Orleans Batture. The Batture was claimed by Edward Livingston as his private property. Mr. Jefferson, then President of the United States, treating it as public property to which the provisions of this Act applied, instructed the Marshal to remove all persons found upon it, and take possession of it for the United States. Under these instructions, Mr. Livingston was dispossesed; and hence arose the celebrated controversy between himself and Mr. Jefferson, in the course of which was written by the latter the pamphlet referred to by the appellant's counsel, and an extract from which is given in the appellant's printed brief. As an answer to the arguments of Mr. Jefferson, I should desire to submit those of Mr. Livingston himself—a man more distinguished than Mr. Jefferson for profound knowledge of the law. But I have been unable to find any of the writings of Mr. Livingston upon the subject.

The opinions of Mr. Jefferson, quoted by the appellant, are not to be regarded as his deliberate and unbiased judgment, but rather as the argument of a heated disputant. He had been bitterly assailed, and in this pamphlet was arguing his own cause and seeking to vindicate his own conduct. Deliberately, and as a sober conviction, he could never have contended that "the holders of property are safe against the nation by its own justice."

It is to be observed, that this Act of 1807 applies only to lands "ceded or secured to the United States by any treaty with a foreign nation, or by a cession from any State to the United States;" in other words, to lands to which the United States have clear title, in which

she has parted with no interest, and in which, consequently, there can clearly be no adverse right on the part of individuals. It applies only to those who are manifestly mere intruders, wrongdoers, trespassers upon that possession of the Government which results from its title. So, Mr. Jefferson speaks only of the exercise of this power of removal " where the nation holds lands in its own possession," and the opinions of the Attorney General, to which we are referred, were given in cases of mere intrusion manifestly without right.

An application was made to the President of the United States to remove a Mr. Henderson, who was represented to be an intruder upon the public lands. It afterwards appeared that he was in possession under a Spanish title. Thereupon Mr. Wirt, then Attorney General of the United States, gave the opinion that " Mr. Henderson was not an intruder within the meaning of the Act of the third of March, 1807, and consequently it was not competent for the Executive to remove him by force under that law." Vol. 2 Public Lands, Laws, Instructions and Opinions, p. 166.

In 1833, a question was submitted to Mr. Taney, then Attorney General of the United States, in regard to the construction of this Act, and its application in the case of lands ceded to the United States by the Creek Indians. In his opinion he says : " The white men who have entered upon this land are unquestionably intruders within the meaning of the law." The Act " proposes to defend the possessions of the United States against wrongdoers, who, without any pretense of title, and in open violation of the rights of the United States, intrude upon the public property, and appropriate it to their own use." " Indeed, it can hardly be supposed by any one that the United States have not the same right that an individual possesses, to defend their possessions, by force, against a trespasser. Must they surrender up the possession of the public property whenever lawless violence attempts to seize upon it ? It cannot be imagined that the United States are bound to stand idle and see their possessions wrested from them, and then be put to their action of ejectment to regain possession of their forts, arsenals and light houses, or to resort to a replevin to recover the public arms and accoutrements, or an action of trover to obtain compensation in damages for their loss." Same vol., pp. 181 to 183.

This opinion points out the distinction between the case referred to by Mr. Taney, and the one before this Court. The United States had never abandoned the possession, and the intruders never acquired a lawful possession against them. The State of California DID abandon its possession, and McCauley acquired against the State a lawful possession for a term of years.

I have examined the authorities cited in behalf of the appellant, and find in them nothing inconsistent with the views here expressed.

In The Fire Department of New York v. Kip, 10th Wend. 266, it was held only that "when, for the violation of an Act of the Legislature, a FORFEITURE of goods and chattels is imposed, and a right to sue for such violation is given by statute, the right to the property does not *ipso facto*, by the prohibited act being done, vest in the party to whom the property is given, but that a proceeding in a COURT OF LAW must be had ADJUDGING THE FORFEITURE and DECLARING THE PARTY entitled to the property; and that such proceeding has not been had, may be objected even by the officer who seized the property under the initiatory proceeding, in an action against him by the party claiming to be entitled to the property as forfeit.

In Fairfax's Devisee v. Hunter's Lessee, 7 Cranch. 622, the question was, whether an alien enemy could take lands in Virginia by devise, and hold them until office found. Lord Fairfax had been the owner of certain land called the Northern Neck of Virginia, under title derived from the Crown of England by grant. He died during the War of the Revolution, and devised the land to Denny Fairfax, a British subject and alien enemy, who continued seized of the land at the treaty of peace, and by the treaty it was stipulated that no future confiscations could be made; the land was granted by the State to Hunter. For the devisee of Fairfax it was contended that he was competent to take and hold the title until divested by office found, and that there having been no office found prior to the treaty, nor any equivalent act done to vest the estate in the Commonwealth, the treaty released the forfeiture, and his title had become perfect. Against this it was contended that the title of the Commonwealth was complete before the treaty by the death of Lord Fairfax; that the office was no part of the TITLE; that it was the remedy and not the right. The

Court held, that it was clear by the common law that an alien could take land by purchase, and that it was settled upon the fullest authority, that the title so acquired was not divested until office found.

In Craig v. Radford, 3 Wheat. 594, the same point arose, and the same decision was made upon the authority of Fairfax's Devisee v. Hunter's Lessee.

In the case of the State ex rel. v. Arledge & Gaither, 1 Bailey's South Carolina Rep. 551, it was determined only that it was proper for the State to recover the possession of land to which it had title by information of intrusion, filed by the Solicitor of the State, and upon which the defendant could answer and a trial be had as between citizen and citizen ; and that the State could not maintain trespass to try title or ejectment, because it could not be disseized.

It would seem, then, that giving to the power of the King of England, and of the Government of the United States, the utmost extent which has been claimed for it, it would reach only to the removal of a mere intruder, who has no claim of right, and indeed no possession. How far short does this fall of any application to the case before the Court, which is not one of intrusion, nor of mere claim of right, but one of lawful possession under the deed of the State !

Whether the contract of lease was valid or not, was a question for judicial determination.    Both parties had acted under it.    The possession of the property was delivered and held under it.    That possession was itself property, and entitled to the same protection as the most perfect title.

The Act of the Legislature of the twenty-sixth of February, 1858, under which the appellant justifies, was unconstitutional and void, and can afford no protection for the wrongful act which he has committed. He stands in the same position as a Sheriff or other ministerial officer acting under process absolutely void.

The Act was unconstitutional and void :

1st. As impairing the obligation of a contract.

2d. As depriving a person of his property without due course of law.

3d. As the exercise of judicial power.    It was not a law but a sentence in a single case ; a judgment rendered and executed by authority of the Legislature.

McCauley v. Weller.

4th.. And as an appropriation of private property for a public purpose, if it can be so considered, though there is nothing in the Act to indicate such an intention, it is equally unconstitutional and void, for it made no provision for just compensation. .

I do not propose to discuss these propositions. I submit them upon the printed opinion of counsel above referred to, the brief for respondent on file, and the following additional authorities : Sedgwick's Stat. and Const. Law, 158, 173 ; Osborn v. Bank of United States, 9 Wheat. 798, 843, 858; Ponder, Ex'r, v. Graham, 4 Florida R. 23 ; 9 Gill & Johns. 412.

Where is there to be found in the Statute of Forcible Entry and Detainer, any exception from its provisions of those who act in the name of the State, or under a void authority derived from the Legislature ? Is not a forcible wrong done to the possession of a person by one acting in the name of a State, as much within the mischief intended to be remedied by that statute, as a similar wrong done by a private citizen ? Or was it the intention of the statute to repress violence and outrage on the part only of the private citizen, and leave to the dignitaries of the State an unbounded license of oppression, and reserve to those acting in the name of the State a monopoly of wrong !

I do not so read the statute. It declares that " no person or persons shall hereafter make any entry into lands, tenements, or other possessions, but in cases where entry is given by law, and in such cases, not with strong hand nor with multitude of people, but only in a peaceable manner ; and if any person henceforth do to the contrary, and thereof be duly convicted, he shall be punished by fine."

And throughout this Act, it is as general and comprehensive in its terms as language can make it. It provides a remedy for " any unlawful or forcible entry." It makes no exception of the State, nor of the Governor, nor the Lieutenant Governor, nor the Secretary of State, nor any of the less distinguished functionaries of the Government.

Was not the State, and were not all these officers of the State bound by this statute ? If enacted in England, the King would have been bound by it, for " where an Act of Parliament is made for the public good, the advancement of religion and justice, and to prevent injury

33

and wrong, the King shall be bound by such Act, though not particularly named therein." 8 Bacon's Abr. 92.

There being no question of title in the case, and the law under which the defendant justifies, being clearly unconstitutional, and it being in the power of the Justice to declare it so, it only remains to consider whether the entry complained of was forcible within the meaning of the statute. Upon that point, the Court, I apprehend, can entertain no doubt. But in this connection, I would remark, that even had the Act of twenty-sixth February, 1858, been valid and effectual to give the right of entry, (which it was not) under its authority the defendant could not, without violating the provisions of the Statute of Forcible Entry and Detainer, enter upon the respondent's possession " with a strong hand, nor with multitude of people, but only in a peaceable manner." The Act of the twenty-sixth of February, did not authorize the use of force. In making entry as he did, forcibly, " to the contrary" of what is enjoined in the Statute of Forcible Entry and Detainer, the defendant exceeded his authority, and in the words of the statute is to be " duly convicted and punished by fine."

Terry, C. J.—This is a proceeding under the Statute concerning Forcible Entry and Unlawful Detainer to recover possession of certain premises known as the State prison, with damages for the detention.

The facts, as disclosed by the record, are as follow : In 1856, Jas. M. Estill was in possession of the premises, under a lease from R. M. Anderson, Henry Bates and G. W. Whitman, styling themselves " State Prison Commissioners ;" after retaining possession for about one year, Estill assigned the lease and delivered the possession of the premises to plaintiff, who remained in possession by himself and his agents and employés until the first of March, 1858, when the alleged forcible entry was made.

At the time of this entry, plaintiff himself was not upon the premises, but the same was in charge of his agent Sims. Defendant, accompanied by several others, entered a building connected with the prison, and informed Sims that he was the Governor of the State, and had come with the intention to take possession of the premises, pursuant to an Act of the Legislature passed a few days previous. Upon the

refusal of Sims to yield the possession, defendant called·upon a person present, informed him that he was appointed Warden of the prison, and then demanded the keys.    Sims said that the keys were locked up in an adjoining room, and refused to deliver them.    The door of the room was immediately forced by order of defendant, and the keys taken.

A judgment was rendered by the Court below in favor of plaintiff for a restitution of the premises, with damages, and defendant appeals.

The errors assigned are: ˙ 1st. The refusal of the Court to change the place of trial; and, 2d. The refusal to grant a new trial.

The application for a change of venue was made upon affidavits setting up that defendants could not have a fair and impartial trial in the Court below, on account of the bias of the presiding Judge of the County Court, who was charged with having been present, consulting and advising with the agent and counsel of plaintiff during the trial before the Justice; and having, during the progress of such trial, expressed himself so strongly in favor of plaintiff's right to recover, as to occasion remonstrance from bystanders upon the impropriety of such conduct on the part of a judicial officer.

The statute authorizes a change of venue " when, from any cause, the Judge is disqualified from acting."    The things which *disqualify* a Judge are specified in section 87 of the Act " concerning the Courts and Judicial officers," Wood's Digest, p. 157; 1st. When he is a party to, or interested in the action.    2d. When he is related to either party within the third degree; and, 3d. When he has been attorney or counsel for either party. ˙

These are the only causes which work a disqualification of a judicial officer.    The exhibition by a Judge of partisan feeling, or the unnecessary expression of an opinion upon the justice or merits of a controversy, though exceedingly indecorous, improper and reprehensible, as calculated to throw suspicion upon the judgments of the Court and bring the administration of justice into contempt, are not, under our statute, sufficient to authorize a change of venue on the ground that the Judge is disqualified from setting.    The law establishes a different rule for determining the qualification of Judges from that applied to jurors.    The reason of this distinction is obvious.    The province of the jury is, to determine from the evidence the issues of fact

presented by the parties; and their decision is final in all cases where there is a conflict of testimony. Therefore, the expression of an unqualified opinion on the merits of the controversy, which evinces such a form of mind as renders him less capable to weigh the evidence with entire impartiality, is sufficient to exclude a juror.

The province of a Judge is to decide such questions of law as may arise in the progress of the trial. His decisions upon these points are not final; and, if erroneous, the party has his remedy by bill of exceptions and appeal.

If forming or expressing an opinion upon the merits of the controversy was sufficient to disqualify a Judge, it would be necessary that the venue of a cause should be changed, after a mis-trial or the granting of a new trial; for, after hearing the evidence and argument of counsel upon a mis-trial, the Judge would, of course, have formed an opinion upon the merits of the controversy; and the fact of granting a new trial is often equivalent to the expression of such opinion.

The refusal to change the venue is no sufficient ground for reversing the judgment.

Under the second assignment of error, appellants seek to raise a question as to the validity of the lease to Estill, and the assignment of such lease to plaintiff. These points do not arise in the case under consideration, nor can they be considered or determined in this form of action.

The action of forcible entry and detainer is a summary proceeding to recover possession of premises forcibly or unlawfully detained. The inquiry in such cases is confined to the actual peaceable possession of the plaintiff and the unlawful or forcible ouster or detention by defendant—the object of the law being to prevent the disturbance of the public peace, by the forcible assertion of a private right. Questions of title or right of possession cannot arise; a forcible entry upon the actual possession of plaintiff being proven, he would be entitled to restitution, though the fee simple, title and present right of possession are shown to be in the defendant. The authorities on this point are numerous and uniform. We have, therefore, declined to consider the objections which are taken in the briefs of counsel to the validity of the lease and assignment.

The remaining points are:

*First.* "That, admitting the contract to be valid, the State had, at any time, a right to rescind, violate or annul it without the assent of the lessee or his assignees."

*Second.* "That the title of the premises being in the State, she had the right to take the same for public purposes, by providing just compensation therefor; and that such compensation was provided."

Upon the first point, the only authority cited is part of a paragraph taken from the opinion of one of the former Judges of this Court upon an entirely different state of facts; and which, when taken in connection with the context, is not at all applicable to the case under consideration.

Upon the second point, numerous authorities, both English and American, are cited, none of which, as we conceive, are directly applicable to the case under consideration. The English authorities show that an action of ejectment will not lie at the suit of the King; for the reason that the Sovereign cannot be disseized: but it does not follow that he may therefore expel by force a party in possession of lands belonging to the Crown; there are other remedies to which he may have recourse.

"If a man intrude upon the King's lands, an information for intrusion lies in the name of the Attorney General." (Comyn's Dig. Barogatine, D. 74, S. Bacon's Abr. 101) by which proceeding the intruder and all claiming under him could be ousted and enjoined from further interfering with the possession.

The fact that such a remedy is provided to enable the King to recover lands held by a mere intruder, would seem to imply that the right to seize forcibly without legal process, did not exist at common law. In the State *v.* Arledge and Gaither, 1 Bailey South Carolina Rep. 562, quoted by appellants, the Court held that the State could not maintain the action of ejectment. Mr. Justice Johnson says: "It is very clear that in England the King cannot maintain an ejectment to recover lands; and the reason given by Blackstone is, that, on account of his legal ubiquity, he cannot be disseized or dispossessed. All the elementary writers hold the same doctrine; and it is even more strikingly applicable, where the sovereign power and right are

in the hands of the people themselves, who want that personal identity on which a disseizure could operate; and for the further reason, that a part of it abides in the defendants themselves." But the Court did not hold that the State could, by its officers, resume possession without process; on the contrary, it was held that the remedy was by information for intrusion.

It is undoubtedly the practice of the United States Government to remove intruders upon the public lands without legal process; this proceeding is authorized by Act of Congress of March, 1807, the validity of which Act is sustained by the opinions of various Attorney Generals of the United States. The provisions of this Act, however, and the principles announced in the opinions referred to, apply only to intruders or trespassers on the public domain without claim or right, and have in no case been extended to a *bona fide* possession under color of title. On the contrary, it has been expressly held not to apply to such cases. Public Lands, Laws, Instructions, and Opinions, vol. 2, page 166.

Chief Justice Taney, while Attorney General, asserted the power of the United States, under the Act of 1807, to expel intruders from lands ceded by the Creek Indians, on the ground that the parties were mere wrongdoers, " who, without any pretense of title, and in open violation of the rights of the United States, intrude upon the public property and appropriate it to their own use;" and that " the United States had never abandoned their possession, and the intruders had never acquired a lawful possession against them," but were mere naked trespassers upon the public domain. See Public Lands, Laws, etc., vol. 2, p. 181.

There is a vast difference between the case of a mere wrongdoer, and one who enters by the license and consent of the Government.

In the present case, it appears that plaintiff and his assignor had been in the actual peaceable possession of the premises for a period of nearly two years, under color of title purporting to be derived from the State. The legality of his possession, and the validity of the contract under which he held, had been recognized by the successive Legislatures, as appears by the Acts of 1856 and 1857, by which appropriations were made pursuant to the terms of the contract, and

by the journals of the Legislature. Plaintiff can, then, in no sense be considered as an intruder, without claim or pretense of title ; and the reasoning of the authorities, cited from the opinions of the Attorney General of the United States, does not apply to the facts of this case. The possession of plaintiff having been acquired by the consent of the Legislature, and been recognized by it as legal, could only be legally divested by the judgment or decree of a competent Court.

It is said that the State cannot commit a forcible entry. This position will not, I presume, be controverted ; but the defendant is not the State ; and certainly there is no reason why a public officer, who acts without authority, or under a void authority, or who transcends the authority conferred by law, should not be held to strict accountability for such act.

The objection that the entry complained of was not forcible, is entirely unsupported by the facts disclosed by the record. Several men go to an outer building, occupied by the agent of plaintiff, and in which were the keys of the premises, against the will, and notwithstanding the protest of this agent ; an inner door is forced and the keys taken, with which an entry into the main building is effected. The acts of the parties warranted no other conclusion than that any attempt on the part of the plaintiff to resume possession would be resisted by force.

"To constitute forcible entry and detainer, it is not necessary that violence and outrage upon the prison and property should in fact be resorted to. If the actual possession of another in a house or tenement be taken and held under circumstances which show that it will not be surrendered without a breach of peace on the one side or the other, this constitutes a case of forcible entry and detainer." Childers v. Black, 9 Yerg. 317 ; 1 Scam. 407.

The statute was intended to prevent bloodshed, violence and breaches of the peace, too likely to result from wrongful entries into the possession of others ; and it would be absurd to say, that to enable a party to avail himself of its provisions, there must have occurred precisely the evil which it was the object of the law to prevent. The power of the Legislature to absolutely control the custody and disposition of the State prisoners, and to enter upon the premises for the purpose of

removing such persons, does not arise in this case, and we are not disposed to question its authority to do so.

The simple question involved in the record is, whether premises, which were in the peaceable and actual possession of plaintiff, were forcibly and unlawfully entered and *detained*.

The last point is, that, " admitting these premises to be the private property of plaintiff, still the State had the constitutional power to take it for public purposes, by providing just compensation therefor ; and it is immaterial whether the compensation was provided in the Act directing the seizure of the property, or by subsequent Act."

The first proposition is entirely true, but the Act under which defendant justified his entry, made no sort of provision for any compensation whatever, and was clearly in violation of the eighth section of article one of the Constitution.    For the second proposition, we can find no authority ; and we are unable to see how an illegal entry on the first of March can be affected by the passage of an Act some two months thereafter.

It is well settled, and upon this point there is no conflict of authority, that when private property is taken for public use, the means of compensating the owner must be provided before the property can be taken.    Smith Com., 473, *et seq.* ; San Francisco *v.* Scott, 4 Cal. 114 ; McCann *v.* Sierra Co., 7 Cal. 121.

The judgment of the Court below is affirmed.

FIELD, J.—The validity of the lease from the State cannot be tried in the present action, nor can the plaintiff be deprived of the advantages resulting from the possession of the premises, by a forcing ouster under any legislative enactment.    Assuming the lease to have been valid, there was in the plaintiff a property of which he could not be divested for public use without just compensation.    His right, so far as the land and buildings were concerned, was in no respect affected by the fact, that they were designed as a place for the confinement of convicts.    The purposes for which premises are leased cannot alter the nature of the leasehold interest as property.    To take such property without compensation is beyond the reach of legislative power. Such compensation must be made, or a fund provided from which it

McCauley *v.* Weller.

can be made in advance.   So strictly is this rule adhered to, that the enforcement of any statute to take such property, where the indemnity has not been provided, will be stayed by injunction.   The appropriation without providing the compensation is unconstitutional and void.   In Gardner *v.* Village of Newburgh, (2 John. Ch., 162) Chancellor Kent said :   " To render the exercise of the power [to take private property for public purposes] valid, a fair compensation must, in all cases, be previously made to individuals affected, under some equitable assessment to be provided by law.   This is a necessary qualification accompanying the exercise of the legislative power, in taking private property for public uses ; the limitation is admitted by the soundest authorities, and is adopted by all temperate and civilized governments, from a deep and universal sense of its justice."

In Bloodgood *v.* The Mohawk and Hudson Railroad Co. (18 Wend. 17) Chancellor Walworth, in expressing his dissent to a decision of his predecessor, in Jerome *v.* Ross, (7 John. Ch. 344) that it was not necessary to the validity of a statute authorizing private property to be taken for public use, that a remedy for compensation to the owner should be provided, said :

" On the contrary, I hold that, before the Legislature can authorize the agents of the State and others to enter upon and occupy, or destroy or materially injure the private property of an individual, except in cases of actual necessity which will admit of no delay, an adequate and certain remedy must be provided, whereby the owner of such property may compel the payment of his damages, or compensation ; and that he is not bound to trust to the justice of the Government to make provision for such compensation by future legislation.   I do not mean to be understood that the Legislature may not authorize a mere entry upon the land of another, for the purpose of examination, or of making preliminary surveys, &c., which would otherwise be a technical trespass, but no real injury to the owner of the land, although no provision was made by law to compensate the individual for his property, if it should afterwards be taken for public use.   But it certainly was not the intention of the framers of the Constitution to authorize the property of a citizen to be taken and actually appropriated to the use of the public, and thus to compel him to trust to the future justice

of the Legislature to provide a compensation therefor. The compensation must be either ascertained and paid to him before his property is thus appropriated, or an appropriate remedy must be provided ; and upon an adequate fund, whereby he may obtain such compensation, through the medium of the Courts of justice, if those whose duty it is to make such compensation, refuse to do so." Sedgwick on Statutory and Cons. Law, 525, 526, 533.

The same effect are the decisions of the Court. In the case of the City of San Francisco *v.* Scott, (5 Cal. 114) a street was extended through the property of one Price, by ordinance of the Common Council of the city, and in conformity with the requirements of its charter, assessments were. made of the damages caused to each individual by the extension. To Price, who was in possession of a portion of the land appropriated, an award of $1,925 was made. Shortly afterwards, the street was opened, and it remained open for four or five months, during which period it was used as a public thoroughfare. At the expiration of this period, the award not being paid, the defendant, as agent of Price, entered upon the land and obstructed the street, claiming, on behalf of his principal, the right to reappropriate the same to private use. For the obstruction the defendant was prosecuted before the Recorder, by whom judgment was passed against him. On appeal, the judgment was reversed, with the concurrent opinion of all the Judges. " Our bill of rights," said the Court, " provides that private property shall not be taken for public use, without just compensation being made therefor ; and it is now the better opinion, that such compensation must be made before the citizen can be divested of his rights. It is not sufficient that the law points out the mode by which the damage may be ascertained, and provides the party with a remedy to enforce his rights ; no such obligation can be imposed upon him ; he is entitled to the damages which he has sustained; without resorting to a legal tribunal to enforce the payment. The law watches the exercise of this prerogative of sovereignty with a zealous regard for the rights of the citizen.

" Admitting all the steps for opening this street were properly and legally taken, (a proposition denied by appellant's counsel) it is evident the premises in question did not become a public street by virtue

of such ordinance, until the city had paid or tendered the amount of the assessment to the defendant ; in other words, a city ordinance could not divest the title to private property, and *ex proprio vigore* operate a dedication to the public use."

In McCann *v.* Sierra County, (7 Cal. 121) the Supervisors of that county had, by resolution, extended a street or thoroughfare through the land of the plaintiff, without providing any compensation for the private injury consequent thereon ; and the Court, all the Judges concurring, said : " The Constitution of California provides, ' that private property shall not be taken for public use, unless just compensation be made therefor.' A similar provision is to be found in the Constitution of every State in the Union ; and the result of the decision on this subject may be briefly stated thus : That compensation must be made in advance, or a fund must be provided, out of which compensation shall be made, so soon as the amount can be determined. The property of the citizen cannot be taken from him without ample means of remuneration are provided. From this it results that the act of the Supervisors of Sierra county, in appropriating the property of the plaintiff to public uses, before making provision for paying him the value thereof, was illegal, and that he might resort to the Court of Equity to restrain them from interfering with the freehold."

It is, then, the settled law, that the compensation, or the offer of it, must proceed or be concurrent with the seizure and entry upon private property of the citizen. It may not be absolutely essential that the compensation should be provided in the same Act which authorizes the siezure ; but it is essential that it should be provided before the seizure can be enforced or justified. Little, indeed, would be the security afforded to the citizen, if his property could be taken by the agents of government, and himself left to the future sense of justice of the Legislature. It would be poor consolation to the head of the family, stripped of his entire possessions, to be informed that the Legislature would, at some subsequent day, deal fairly by him.

The statute upon which the Governor bases his defense and justifies his acts in terms, authorizes and empowers him, and, in fact, makes it his duty, to take immediate possession of the State prison and grounds,

together with all the property of the State therein situated, and to assume the custody, control and management of the State prison convicts therein confined, or to be therein confined, and thereafter to continue the possession of the property and the control of the convicts until further provided by law.   The prison and grounds, which the Governor was thus directed to take and retain possession of, were in the possession of the plaintiff, with color of title under the claim of right, upon a lease of five years.   Had these premises been a warehouse, occupied by a tenant under a lease from the State, for the ordinary purposes of mercantile business, no one would have had the hardihood to uphold the validity of a statute directing the seizure of the same and the dispossession of the tenant, except by regular proceedings in the tribunals of the country.   How does the case at bar differ from the case supposed ?   Grounds and buildings were leased ; the leasehold interest was property, and for its enjoyment against invasion and seizure under attempted legislation, or by individual violence, the plaintiff could claim the protection of the Constitution.   The fact that the grounds and buildings leased were used for the confinement of State convicts, does not alter the case.   The right to the labor of the convicts is not involved.   That the State may not have any other place of confinement, as urged in argument, is its misfortune, but cannot impair the right of the plaintiff to hold the premises until indemnified for their taking.   If the State had leased out the Capitol, it would afford no justification for seizing and dispossessing the tenant, that it had no other place for the meeting of the Legislature.   The difficulty under which the State is resting, arises from the provisions of the lease, and the failure to insert a clause for the repossession of the premises whenever the Legislature should determine to resume the control of the prisoners.

What I have thus far said, has been upon the supposition that the lease from the State is valid, for its invalidity cannot be questioned in this form of proceeding.   In any view, whether valid or invalid, it gave a color of title to the plaintiff.   It took from his possession the character of intrusion without claim of right, which alone the government can remedy by force.   Where private right is asserted, the

McCauley *v.* Weller.

government is as impotent as the humblest citizen to impair or destroy it. The validity of the lease could only be determined in a different tribunal and by proceedings of a different character.

Nor could the validity of the assignment from Estill to the plaintiff be the subject of consideration in the present action. The plaintiff was in peaceable possession ; the defendant ousted him by force ; and before the legality of the title of the parties to the premises can be the subject of consideration, they must be placed *in statu quo* with reference to the property. The law will not suffer the defendant, or those whom he represents, to enjoy the advantages resulting from the possession when obtained by violence and force.

Nor can the defendant rest his justification upon any possible for-feiture of the lease. Such forfeiture cannot be asserted except by force of a judicial determination. The Legislature cannot take upon itself, nor the officers of government upon themselves, to adjudge what right has accrued to the State, and then proceed to enforce it, any more than a private citizen. For the recovery of money due, or the possession of property withheld under a claim of right, the Legislature, and the highest officer, and the humblest citizen, stand upon the same footing, and must pursue the same course.

There may be, and probably is, great truth in the observance of the Attorney General, that in the hands of the defendant and those associated with him, the management of the State prison has been eminently wise and economical, and one which reflects great credit upon him and them. This may all be so, but it is difficult to see what bearing it can have upon the rights of the plaintiff. There would undoubtedly have been the same wise and economical management, if the Governor had taken by force, for the confinement of the prisoners, any other equally capacious property, belonging to any private citizen, other than the plaintiff.

I concur in the affirmance of the judgment.