Filed 4/7/16  Safarian Choi & Bolstad, LLP v. Minassian CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SAFARIAN CHOI & BOLSTAD, LLP, | B262526 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS150950) |
| v. | |
| SHAHEN MINASSIAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Susan Bryant-Deason, Judge.  Affirmed.

Arthur Minassian for Defendant and Appellant.

Safarian Choi & Bolstad LLC, David C. Bolstad and Jerome M. Jauffret for Plaintiff and Respondent.

_____

This appeal stems from a fee dispute between Shahen Minassian and Safarian Choi & Bolstad, LLP (SC&B). The fee dispute was arbitrated under a program administered by the Los Angeles County Bar Association (LACBA). The panel of arbitrators issued a decision awarding SC&B $36,508 in fees, which was approximately $6,000 less than what it sought. The panel's award was confirmed by the trial court. We affirm the judgment.

**FACTS**

SC&B represented Minassian in a lawsuit which alleged he misappropriated property owned by the plaintiffs' deceased parents in Iran. SC&B filed a forum non conveniens motion, arguing Iran was a more convenient forum in which to litigate the suit since the properties and evidence were located there. The trial court granted the motion on October 23, 2013.[1] The next month, SC&B presented Minassian with his first bill for their services. The present fee dispute ensued.

When Minassian engaged SC&B to represent him in the underlying matter, he provided them with a $10,000 retainer. He also signed a written fee agreement on March 30, 2013, which identified the $10,000 as an advance on fees. The agreement set forth a rate of $425 per hour for work performed by attorney David Bolstad, which he noted was an agreed upon discount of $70 per hour, and $250 per hour for his associate's work. The agreement cautioned, "it is impossible to determine in advance the amount of fees and costs needed to complete this matter."

Despite the terms of the agreement, Minassian contends the parties had a "handshake agreement" that SC&B would handle the initial motions for no more than $10,000. This was because Minassian's son, Arthur Minassian,[2] was an attorney and

---

[1] By opinion dated February 17, 2015, we reversed the trial court's ruling, finding Iran was not a suitable alternative forum for the parties' dispute and remanded the matter for further proceedings. (*Aghaian v. Minassian* (2015) 234 Cal.App.4th 427.) The fee dispute and arbitration occurred prior to our opinion.

[2] For convenience and to conform to the manner in which they refer to themselves, we refer to Minassian by his surname and to his son by his first name.

2

"would do a lot of the hard work regarding the facts, the documents, the experts and the translations." Arthur was a witness to the handshake agreement. In his initial meeting with Bolstad, which Arthur also attended, Minassian agreed to pay a $5,000 retainer. He was surprised to see the retainer increased to $10,000 in the written fee agreement, but signed it "since I had agreed to pay him that amount anyway." Minassian believed the handshake agreement trumped the written agreement.

On November 19, 2013, Arthur received an invoice from SC&B for approximately $43,000. After the retainer was applied, SC&B sought to recover approximately $33,000 from Minassian. He disputed the bill and the parties submitted the matter to arbitration under a program administered by the LACBA. Minassian argued the handshake agreement trumped the written fee agreement. He also argued the fee agreement was void because SC&B violated the terms of the fee agreement by failing to issue monthly invoices, charging a higher hourly rate than stated, applying the advance fee to the invoice and failing to deposit it into its general trust account, and failing to identify the timekeeper whose work was being charged. Minassian further alleged Bolstad was suspended from the bar for failure to pay membership dues from July 2, 2013 until August 14, 2013, yet continued to bill Minassian for his work during that time. Thus, SC&B was entitled to the agreed-upon $10,000 at best, or nothing at all for its violation of its ethical and fiduciary duties. SC&B disputed Minassian's characterization of their agreement and argued it was entitled to the full amount invoiced.

The arbitration hearing was conducted on July 1, 2014. Minassian, still in Iran, testified by declaration. Arthur testified to his knowledge of the agreement. He also served as Minassian's attorney at the arbitration and presented testimony from Edward McIntyre, an expert witness who opined on attorneys' duties and ethics. The arbitration panel, which consisted of Terry D. Shaylin, Melinda Gagyor, and Berne Rolston, issued a statement of decision on August 7, 2014. The panel unanimously found the engagement letter to be void because SC&B failed to issue monthly invoices and the invoice it did issue failed to clearly identify who worked on what. Nevertheless, the panel held SC&B was entitled to a reasonable fee for the services it rendered, amounting to $33,019, or a

3

15 percent reduction of the fees charged. The panel also allocated $2,259.84 in arbitration filing fees to Minassian and costs of $1,229.70 for a total award of $36,508.54. After applying the $10,000 retainer, the panel calculated the net amount Minassian was to pay SC&B to be $26,508.54.

SC&B petitioned the trial court to confirm the arbitration award on August 27, 2014, while Minassian sought to vacate the award. The trial court confirmed the arbitrators' award and judgment against Minassian was entered January 6, 2015. Minassian timely filed a notice of appeal on March 9, 2015.[3]

## DISCUSSION

Section 6200 et seq. of the Business and Professions Code establishes a system "for the arbitration . . . of disputes concerning fees, costs, or both, charged for professional services by members of the State Bar . . . ." (Bus. & Prof. Code, § 6200, subd. (a).) In appropriate circumstances, an arbitration award in a matter involving a fee dispute may be confirmed, corrected, or vacated under Code of Civil Procedure[4] section 1285 et seq., the statutory scheme governing arbitrations in general. (Bus. & Prof. Code, § 6203, subd. (b).) Under this provision, a court shall vacate the award if it finds, among other things, that the rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause or by the refusal of the arbitrators to hear evidence material to the controversy or by the failure of the arbitrator to disclose a ground for disqualification. (§ 1286.2, subd. (a).)

Minassian challenges the trial court's order confirming the arbitration award on the same grounds he sought to vacate the award below: (1) Rolston, the panel chair, failed to disclose that 50 percent of his practice involves representing lawyers and law

---

**3** In a supplemental request filed October 1, 2015, Minassian asked us to take judicial notice of the complaint he filed against Bolstad and SC&B alleging malpractice and of correspondence related to a State Bar investigation of Bolstad initiated by Arthur. We decline to take judicial notice of these documents. (Cal. Rules of Court, rule 8.252.)

**4** All further section references are to the Code of Civil Procedure unless otherwise specified.

4

firms, thus causing a person to reasonably entertain a doubt as to his impartiality; (2) the panel erroneously refused to compel production of SC&B's trust account records; and (3) the panel refused to continue the arbitration hearing to allow Minassian to testify.

We review de novo the trial court's order confirming the arbitration award. (*Advanced Micro Devices, Inc. v. Intel Corp*. (1994) 9 Cal.4th 362, 376, fn. 9; *Glaser, Weil, Fink, Jacobs & Shapiro, LLP v. Goff* (2011) 194 Cal.App.4th 423, 433.)  To the extent the trial court's decision to grant the petition to confirm and deny the petition to vacate the award rests on its determination of disputed factual issues, however, we review the court's orders under the substantial evidence standard.  (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1217; *Lindenstadt v. Staff Builders, Inc*. (1997) 55 Cal.App.4th 882, 892, fn. 7.)

## I.  Appearance of Partiality

Subsequent to the panel's decision, Minassian discovered that "[s]ince 1982, more than 50% of [Rolston's] practice has involved the representation of lawyers and law firms in connection with the legal problems that arise between law partners or law partners and law firms (and vice versa)."  Minassian contends Rolston improperly failed to disclose this material information, which would cause a person to reasonably doubt his impartiality in the matter.

Section 1281.9 imposes on arbitrators a duty to "disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" and sets forth six specific facts required to be disclosed.[5]  (§ 1281.9, subd. (a).)  An arbitrator's failure to disclose facts as required by

---

[5]     The required disclosures include:  "(1) The existence of any ground specified in Section 170.1 for disqualification of a judge . . . .  [¶]  (2) Any matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter.  [¶] (3) The names of the parties to all prior or pending noncollective bargaining cases in which the proposed neutral arbitrator served or is serving as a party arbitrator for any party to the arbitration proceeding or for a lawyer for a party and the results of each case arbitrated to conclusion . . . .  [¶]  (4) The names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is

5

section 1281.9 warrants vacation of his or her award. (§ 1286.2, subds. (a)(2), (6); *Casden Park La Brea Retail LLC v. Ross Dress for Less, Inc*. (2008) 162 Cal.App.4th 468, 476-477; *Ovitz v. Schulman* (2005) 133 Cal.App.4th 830, 845.) The California Supreme Court has held the six disclosure requirements under section 1281.9 are not exclusive, however. (*Advantage Medical Services, LLC v. Hoffman* (2008) 160 Cal.App.4th 806, 817 (*AMS*).)

Thus, in *Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40 (*Benjamin Weill*), an arbitration award in favor of a law firm in a fee dispute with a client was reversed because the chief arbitrator failed to disclose his representation of large law firms in similar cases, including of a law firm in a fee dispute with a client and of another law firm in a malpractice action against it. The description of the chief arbitrator's legal practice showed he often represented "'[a]ttorneys who face charges of misconduct.'" (*Id.* at p. 51.) The court in *Benjamin Weill* held the arbitrator was required to disclose that aspect of his legal practice. (*Id.* at p. 73.)

The law firm argued the disclosure requirements for an arbitrator should not exceed that required of sitting judges under section 170.1.[6] (*Benjamin Weill, supra,* at p. 64.) The court disagreed. It reasoned a judge does not engage in private business relationships comparable to those of an arbitrator and thus does not enjoy or suffer economic consequences as a result of his decisions. (*Ibid.*) On the other hand, an arbitrator's impartiality might be undermined by his substantial business relationships and economic interests. In particular, "'[p]ayments to free market referees raise

serving as neutral arbitrator, and the results of each case arbitrated to conclusion . . . . [¶] (5) Any attorney-client relationship the proposed neutral arbitrator has or had with any party or lawyer for a party to the arbitration proceeding. [¶] (6) Any professional or significant personal relationship the proposed neutral arbitrator or his or her spouse or minor child living in the household has or has had with any party to the arbitration proceeding or lawyer for a party." (§ 1281.9, subd. (a).)

[6] Section 170.1, subdivision (a)(6)(A)(iii), provides that a judge "shall be disqualified" where "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial," which requires the same breadth of disclosure prescribed by section 1281.9.

6

particular concerns insofar as referees may be influenced to decide cases in favor of the party more likely to bring cases to them in the future.'" (*Id.* at p. 68.)

The *Benjamin Weill* court found the *AMS* case illustrative of the dangers involved in an arbitrator's failure to disclose business relationships. There, the arbitrator served as correspondent counsel to organizations tied to Lloyd's of London, which was the insurer for one of the parties to the arbitration, AMS. Although the arbitrator denied that Lloyd's was a client, substantial evidence showed the arbitrator's involvement with Lloyd's, including that he represented two syndicates of Lloyd's, which underwrote 75 percent of AMS's employment practices liability insurance. (*AMS, supra,* 160 Cal.App.4th at pp. 811-812.) The Court of Appeal found that participants in the industry were all very much aware of each other and of their ties to the syndicates and Lloyd's. Therefore, it would be incompatible for anyone working for these syndicates to take action contrary to other participants because it would jeopardize their status in the industry. The arbitrator's award was vacated. (*Id.* at p. 819.)

The *Benjamin Weill* court also found the facts in *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*) to be distinguishable. In *Haworth*, a female patient claimed her physician was negligent in performing cosmetic surgery on her lip. The Supreme Court held the arbitrator, a former judge, was not required to disclose that, "10 years earlier, he received a public censure based upon his conduct toward and statements to court employees, which together created 'an overall courtroom environment where discussion of sex and improper ethnic and racial comments were customary.' " (*Id.* at p. 377.)

The high court rejected the argument that the censure would cause a person to reasonably conclude the arbitrator might be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery. (*Haworth, supra,* 50 Cal.4th at p. 389.) Since possible inferences to be drawn from the censured conduct could point either in favor of the female patient or in favor of the male physician, the public censure "simply provides no reasonable basis for a belief that [the former judge] would be inclined to favor one party over the other in the present proceedings." (*Id.* at p. 391.) As the high

7

court explained, " '[a]n impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason.' [Citation.]" (*Id.* at p. 389, italics omitted.) The court found important a subject matter link between the current arbitration and the matter subject to disclosure, noting, "the subject matter of this arbitration was not such that the circumstance of gender was material, or that gender stereotyping was likely to enter into the decision made by the arbitrators." (*Id*. at p. 391.)

Minassian equates Rolston's perceived bias with the one found in *Benjamin Weill.* We do not agree they are similarly situated. Unlike in *Benjamin Weill*, Rolston represented lawyers against other lawyers, not against clients. In particular, Rolston's personal website explained that Rolston "represent[s] lawyers and law firms in the organization, management and termination of their professional relationships including law firm partnership disputes, partner withdrawals and dismissals. . . ." We fail to see how this would cause a person to reasonably entertain a doubt that Rolston would be able to be impartial to a client. As in *Haworth,* there does not exist a subject matter link between the current arbitration and the matter subject to disclosure. Possible inferences which may be drawn from Rolston's legal practice could equally point to an inclination to favor lawyers or an inclination to disfavor lawyers. Thus, an arbitrator who represents lawyers in actions against other lawyers is not inherently biased in favor of lawyers or against their clients. "'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason*.' [Citation.]" (*Haworth, supra,* 50 Cal.4th at p. 389.)

Neither are we inclined to conclude that, as in *AMS,* Rolston would favor lawyers over clients because he hopes to receive future business from law firms. By representing lawyers against other lawyers, Rolston has already taken action contrary to any potential clients' interests. Unlike the arbitrator in *AMS,* his standing in the legal community is not jeopardized by a ruling against a law firm or lawyer. There is no reasonable basis to believe that Rolston could not be fair to a client in a fee dispute simply as a result of the

8

nature of his legal practice.[7]  We decline to extend the holding in *Benjamin Weill* to require disclosure in this instance.  Accordingly, we hold Rolston was not required under section 1281.9 to disclose to the parties his representation of lawyers against other lawyers and law firms.

## II.     Trust Account Documents

On June 20, 2014, Minassian submitted a request for trust account documents from SC&B.  In particular, Minassian sought information relating to when his $10,000 retainer was deposited or withdrawn from the firm's trust account.  The panel denied the request on June 25, 2014.  Minassian contends those documents were relevant because "Minassian's claim that the parties had an alternative fee agreement would have been bolstered by the fact that the [SC&B] did not handle his $10,000 as a so-called 'Advance Payment,' or fees deposit, or other amount to be charged against fees.  The trust records, based on Bolstad's admission, apparently show that the Safarian Firm treated the $10,000 as an earned fee from the time they received it."  Alternatively, Minassian argues the trust account documents would have shown that SC&B violated the written fee agreement by failing to deposit the money in its trust account.

Minassian relies on *Burlage v. Superior Court* (2009) 178 Cal.App.4th 524 (*Burlage*) to support his argument.  There, the plaintiffs discovered after the close of escrow that their property encroached on the neighboring golf course.  They sued the seller, alleging he was aware of the encroachment but failed to disclose it.  The arbitrator declined to admit into evidence the fact that the title company paid the country club for a lot line adjustment.  Finding error, the appellate court held the title company's action was directly relevant to show the plaintiffs suffered no damages and the evidence should have been admitted.  (*Id.* at p. 530.)

---

[7]     Minassian further challenges the trial court's ruling on the ground it erroneously required him to investigate Rolston's background or establish actual bias.  Because we review the matter de novo, we may disregard these arguments challenging the trial court's reasoning.  (*Haworth, supra,* 50 Cal.4th 372.)

9

Even if we accept the evidence related to the trust account was similarly relevant and should have been admitted, Minassian has failed to show how he has been prejudiced by the panel's decision. Unlike in *Burlage,* where the arbitrator failed to consider the title company's settlement with the country club entirely, it is clear that the panel had before it evidence of SC&B's mishandling of Minassian's retainer fee. Minassian's expert identified the improper handling of the retainer as a basis for his conclusion that SC&B violated its written fee agreement and its fiduciary duties to Minassian. Indeed, Minassian's brief to the panel discussed the improper handling of the retainer fee. This issue was identified and considered by the panel, as shown in its decision, where it noted Minassian's contention that SC&B "did not deposit the 'Advance Fee' of $10,000 into its general trust account." Further, the panel found the written fee agreement to be void. Minassian has shown no prejudice resulted from the panels' decision to deny his request for the trust account documents.

## III.     Continuance

On May 13, 2014, the LACBA appointed a three person panel to hear the arbitration and required the parties to conduct the arbitration hearing by August 13, 2014.[8] On May 27, 2014, Arthur advised Rolston his father would not be in the country until October 2014 at the earliest. He also stated he and his expert witness would have difficulty attending the hearing prior to October 10, 2014, and asked for a 60 day extension of time to complete the arbitration. Arthur noted, however, that Minassian's declaration could be submitted in lieu of live testimony if necessary. The extension was rejected by the panel. It noted either party could submit evidence by way of declaration "with the understanding that the Panel will consider the evidence appropriately and give it such weight as is deemed reasonable under the circumstances." Both Arthur and the expert testified at the hearing, but Minassian was not able to attend. His declaration was considered by the panel instead.

---

[8]     Minassian asserts that the panel imposed the deadline, but the record indicates the LACBA designated the arbitration deadline in its initial communication appointing the panel.

Minassian contends he was prejudiced by the panel's refusal to continue the arbitration hearing by two months so he could testify in person. He asserts his testimony would have been critical to the issue of the handshake agreement, particularly since the panel found the written fee agreement to be void. Although his declaration was considered by the panel, he contends the arbitrators regarded it "as a poor substitute for in-person testimony," and discredited his declaration as measured against Bolstad's in-person testimony on the issue. Thus, "Minassian was unfairly prevented from presenting his case because his oral testimony was prevented when the arbitrators refused to postpone the hearing." We disagree.

The LACBA Rules for Conduct of Voluntary Arbitration of Fee Disputes (LACBA Rules) set forth a proposed time schedule which the LACBA encourages arbitrators to "endeavor to adhere to . . . except where emergencies or circumstances beyond the control of the arbitrator(s), or the parties require short extensions." However, "[u]pon request of a party to the arbitration and for good cause, or upon their own determination, the sole arbitrator or panel may postpone or adjourn the hearing from time-to-time (Code Civ. Proc., Section 1282.2(b))." (LACBA Rules, No. 23.)

Minassian provides no support for his supposition that the panel failed to give his declaration the same weight as if he had testified in person. Minassian contends that Rolston's comments provided ample evidence that his declaration was treated as wholly incredible. For example, Minassian interprets Rolston's comment that "the Panel will consider the evidence appropriately and give [the declaration] such weight as is deemed reasonable under the circumstances" to mean that he would grant it less weight than live testimony. This is pure speculation and does not comport with an actual reading of those words. Minassian also takes issue with Rolston's expressed disbelief of the existence of the handshake agreement. That Rolston did not believe Minassian's version of events does not suggest his in-person testimony would have swayed Rolston. In any event, Arthur testified to his knowledge of the existence of the handshake agreement. He was present at each of the meetings with SC&B. Simply put, the panel did not believe the handshake agreement existed. Minassian has failed to show his in-person testimony

11

would have convinced them when his declaration and Arthur's in-person testimony about it did not.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

BIGELOW, P.J.

I concur:

GRIMES, J.

**Safarian Choi & Bolstad LLP v. Minassian - B262526**

RUBIN, J. – Dissenting.

Although I agree with much of the majority opinion, I respectfully dissent. In my view and as I explain below, to some extent the court's opinion has failed to distinguish grounds for *disqualification* from required *disclosure*. This is not surprising because the two concepts are closely interwoven and language contained in California statutes and prior versions of the California Canons of Judicial Ethics has contributed to the confusion. The information about the neutral arbitrator's law practice in this case, when considered in light of the applicable standard for *disclosure*, compels me to conclude that the information here should have been disclosed. The failure to do so requires vacating the arbitration award.

A.     *The Case Law on Which the Majority Relies*

I have no quarrel with the majority's analysis of the three principal cases on which it relies: *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*), *Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40 (*Benjamin Weill*), and *Advantage Medical Services, LLC v. Hoffman* (2008) 160 Cal.App.4th 806 (*AMS*). I also agree that the facts of two of these cases bear little resemblance to the present case. In *Haworth*, the arbitrated dispute was a medical malpractice case filed by a female plaintiff. The arbitrator, a former superior court judge, had been previously disciplined by the Commission on Judicial Performance for making inappropriate comments to female court employees. The female patient in the pending case claimed that information should have been disclosed. In *AMS*, the arbitrator failed to disclose previous business relationships as an attorney with the insurance underwriter involved in the arbitration dispute. In the former case, our Supreme Court confirmed the award; in the latter, the Court of Appeal vacated it.

The case that comes closest to the present appeal is *Benjamin Weill*. There, an attorney arbitrator in a fee dispute between a client and her lawyer failed to disclose, in the words of the majority, "his representation of large law firms in noteworthy cases,

1

including of a law firm in a fee dispute with a client and of another law firm in an action against it [for attorney malpractice and related torts]." (Maj. opn., at p. 6.) The arbitrator's webpage said that he often represented attorneys "who face charges of misconduct." (*Benjamin Weill*, *supra*, 195 Cal.App.4th at p. 51.) The Court of Appeal reversed the trial's court order confirming the award and directed the trial court to vacate the award.

B.      *Application of the Cases to the Present Dispute*

I agree that the present case is not as egregious as *Benjamin Weill*, although "not as egregious" arguments rarely take us very far. The record in the current appeal contains no suggestion that the arbitrator represented lawyers in legal malpractice actions filed by clients or in fee disputes between lawyers and clients. His practice was nevertheless heavily skewed toward representing lawyers on other important matters, such as partner expulsions or withdrawals, and providing arbitration services relating to internal law firm disputes. His resume stated that he had significant expertise in the specialty of Law Practice Management, a subject he had also taught at the University of Michigan. In other words, he is a lawyer's lawyer. To be sure, his clients and the clients of opposing parties all appear to be lawyers, such that one could infer he has seen the pluses and minuses of lawyers' conduct in his specialized field of practice. Nevertheless, I do not believe the distinction between this case and *Benjamin Weill* supports the majority's holding: "We fail to see how this would cause a person to reasonably entertain a doubt that Rolston [the arbitrator] would be able to be impartial to a client." (Maj. opn., at p. 8.)[1] Although I come to the opposite conclusion from the majority using the standard

---

[1]      In support of its holding, the majority states: "Possible inferences which may be drawn from Rolston's legal practice *could* equally point to an inclination to favor lawyers or an inclination to disfavor lawyers." (Maj. opn., at p. 8, italics added.) I do not agree with the reasonableness of the latter inference, but, as I discuss below, the fact the majority acknowledges one could infer "an inclination to favor lawyers," squarely places the withheld information within the required disclosure of "all matters that *could* cause a person aware of the facts to reasonably entertain doubt that the proposed neutral arbitrator would be able to be impartial." (Code Civ. Proc., § 1281.9, subd. (a), italics added.)

2

adopted by the majority (as quoted in the preceding sentence), I believe the majority has not employed the proper test for deciding such cases. As have many other courts, the majority conflates the rules governing disclosure with those requiring disqualification. By applying a different analysis of the disclosure and disqualification rules, I believe the case for disclosure of the arbitrator's law practice is compelling.

C.      *A Brief History of the Development of Judicial Disqualification and Disclosure*

The disconnect between disclosure and disqualification has a long history:  it starts with the basic notion that judges may be disqualified. None of these earlier cases, of course, deals with the more modern enterprise of arbitration, and the Supreme Court has observed that the standards for disclosure by and disqualification of arbitrators differ from disclosure and disqualification of judges. (*Haworth, supra,* 50 Cal.4th at pp. 393-394 & fn. 14.)  But the court has also also found similarities between the arbitral and judicial disclosure and disqualification rules, holding in *Haworth* that the judicial standard for appearance of impartiality "is explicitly made applicable to arbitrators. (§ 1281.9, subd. (a)(1) [proposed neutral arbitrator must disclose '[t]he existence of any ground specified in Section 170.1 for disqualification of a judge.'].)"  (*Id*. at p. 393.) Accordingly, it seems appropriate to review briefly the development of our rules for judicial disclosure and disqualification, and then consider their application to arbitrations.

To put matters in context, it was not until 1984 that the Legislature enacted a version of the current statute that disqualifies a judge if a "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).)  Because the arbitration statute at issue here, section 1289, expressly relies on the substantive provisions for judges under section 170.1 (see § 1281.9, subd. (a)(1)), a brief history of section 170.1 is helpful to our understanding of the principles governing disclosure and disqualification for arbitrators.

---

All future section references are to the Code of Civil Procedure.

Many of the early cases from the 19th century mention judicial disqualification only in passing and deal primarily with the transfer of cases from one county to another because a judge had been disqualified.  These cases contain no discussion of the legal grounds for disqualification.  (See, e.g., *Townsend v. Brooks* (1855) 5 Cal. 52; *People ex rel. Attorney Gen. v. Wells* (1852) 2 Cal. 198.)

An early case that described the limits of judicial disqualification around this time was *McCauley v. Weller* (1859) 12 Cal. 500.  There, the trial judge's behavior suggested he could not be impartial, and on appeal it was alleged that he should have been disqualified.  The Supreme Court concluded that under then current law the judge was not disqualified, and affirmed the judgment.  The court described the conduct and then stated that impartiality was not a ground for disqualification:

"The application for a change of venue was made upon affidavits setting up that defendants could not have a fair and impartial trial in the Court below, on account of the bias of the presiding Judge of the County Court, who was charged with having been present, consulting and advising with the agent and counsel of plaintiff during the trial before the Justice; and having, during the progress of such trial, expressed himself so strongly in favor of plaintiff's right to recover, as to occasion remonstrance from bystanders upon the impropriety of such conduct on the part of a judicial officer.  [¶]  The statute authorizes a change of venue 'when, from any cause, the Judge is disqualified from acting.'  The things which *disqualify* a Judge are specified in section 87 of the [Practice] Act 'concerning the Courts and Judicial officers,' Wood's Digest, p[age] 157; 1st.  When he is a party to, or interested in the action. 2d.  When he is related to either party within the third degree; and, 3d.  When he has been attorney or counsel for either party.  [¶] *These are the only causes which work a disqualification of a judicial officer*. The exhibition by a Judge of partisan feeling, or the unnecessary expression of an opinion upon the justice or merits of a controversy, though exceedingly indecorous, improper and reprehensible, as calculated to throw suspicion upon the judgments of the Court and bring the administration of justice into contempt, are not, under our statute, sufficient to authorize a change of venue on the ground that the Judge is disqualified from setting

4

(*sic*)." (*McCauley v. Weller*, *supra*, 12 Cal. at p. 523, second italics added; see also Stats. 1863, art. II, "Particular Disqualification of Judges," § 66.)

From this holding, we see that the early disqualification statutes did not contain a provision comparable to present day section 170.1, subdivision (a)(6)(C)(iii) that requires disqualification if a "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." As I have already observed, it was not until 1984 that this ground for disqualification was incorporated into new section 170.1.[2]

The gestation of the rules for judicial *disclosure* took an entirely different path. To this day, there is nothing in section 170.1 that addresses judicial disclosure. Instead the rules governing judicial disclosure have from the inception been a part of the California Canons of Judicial Ethics (and before that its predecessor, the California Code of Judicial Conduct). The current rule is found in Canon 3E, which provides: [¶] "(2) In all trial court proceedings, a judge shall disclose on the record as follows: [¶] (a) Information relevant to disqualification. A judge shall disclose information that is reasonably relevant to the question of disqualification under Code of Civil Procedure section 170.1, even if the judge believes there is no actual basis for disqualification." (Cal. Code Jud. Ethics, canon 3 (West Cal. Rules of Court, 2016 ed.), p. 1190.)

Before 1993, canon 3 contained no formal requirement that a judge disclose information that might bear on the judge's disqualification. (Cal. Code Jud. Ethics, canon 3 (West Cal. Rules of Court, 1992 ed.), pp. 811-812.)[3] The 1993 Code contained a

---

**2**    Before 1984, the disqualification rules were part of former section 170. Former section 170 did not have an equivalent to current section 170.1, subdivision (a)(6)(C)(iii) and was finally repealed and reenacted to provide that judges have an affirmative duty to decide cases unless disqualified. It was in the same series of amendments that the "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial" language was added, although the subdivision number at the time was (a)(6)(C). (See Stats. 1984, ch. 1555, §§ 1-2, 4-5, pp. 5479-5480.)

**3**    The first set of judicial canons was adopted in 1949 by the Conference of California Judges (now the California Judges Association). The canons, then called the Code of Judicial Conduct, were modified from time to time until early 1995. Proposition

5

commentary to canon 3E that for the first time addressed the question of judicial disclosure. It provided: "A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no actual basis for disqualification." (Com. Cal. Code Jud. Ethics, canon 3 (West Cal. Rules of Court, 1993 rev. ed.), p. 869.)

The disclosure language was originally placed in the commentary, not the canons. The Commentary "provides guidance as to the purpose and meaning of the canons. The Commentary does not constitute additional rules and should not be so construed." (Cal. Code. Jud. Ethics, Preamble (Cal. Rules of Court (West 1996 ed.), p. 929.) By the time the Supreme Court promulgated the first revision of the Code of Judicial Ethics, the disclosure rule was elevated to Canon status, as part of an amended Canon 3E. The new canon continued the same language of the former Commentary to Canon 3E except that the disclosure rule was limited to trial judges.[4] (*Id.* at p. 933.) It was later renumbered canon 3E(2).

The disclosure rule in canon 3E(2) was substantively changed in 2007 to its current iteration: "A judge shall disclose information that is reasonably relevant to the question of disqualification under Code of Civil Procedure section 170.1, even if the judge believes there is no actual basis for disqualification." The change in the canon deletes the former subjective test ("information that the judge *believes* the parties or their lawyers might consider relevant") to one that is objective ("information that is *reasonably relevant* to the question of disqualification"). (Italics added.)

---

190, effective March 1, 1995, added a constitutional provision that required the California Supreme Court to make rules for the conduct of judges and judicial candidates. After adopting the 1992 Code of Judicial Conduct on an interim basis in March 1995, the Supreme Court formally adopted the newly named "California Code of Judicial Ethics" on January 15, 1996. It too has been amended from time to time. (See Preface to California Code of Judicial Ethics, amended January 21, 1995.)

[4]     The rules governing disqualification and disclosure are different for trial judges and appellate justices. (See generally Canon 3.)

6

The common theme in the development of the law of judicial disclosure and disqualification is that the disclosure rules, must, by practical application, be broader than the disqualification rules. If that were not so, the disclosure rules would fall by the wayside because judges would simply disqualify. There would be nothing to disclose. The standards are different for disclosure and disqualification because they serve different purposes. As Judge Rothman has written in his book, "Canon 3E(2) serves the important role of reaffirming the integrity and impartiality of the judicial institution. It provides the parties with the reassurance the judge has examined whether or not certain factors in regard to the case require recusal, that the judge has determined recusal is not required, and that, in spite of that determination, the judge believes the parties and their counsel should be made aware of the factors." (Rothman, Cal. Judicial Conduct Handbook (2007 3d. ed.) § 7.73, p. 381; see also Appendix F.)[5] Disclosure also provides the parties with an opportunity to bring to the court's attention additional information of which the judge was not aware but which might bear on disqualification. And, of course, it provides the parties with information upon which they might seek disqualification of the judge under the for cause procedures of section 170.3. (*Ibid.*)

D.    *The Development of Arbitral Disqualification and Disclosure under California Law*

In contrast to the development of the law as applied to judges, disqualification and disclosure rules for arbitrators have a different bloodline. Section 1281.9, the first arbitration disqualification and disclosure statute, was adopted in 1994.[6] The version of

---

[5]    This edition of the book was written before the 2007 change in Canon 3E(2) that replaced "judge believes" with "is reasonably relevant." The policies described by Judge Rothman are the same under either version.

[6]    Before 1994, case law addressed the issue of arbitral disqualification and disclosure without the benefit of an applicable statute. Thus in *Johnston v. Security Ins. Co.* (1970) 6 Cal.App.3d 839, the Court of Appeal considered the Federal Arbitration Act and the then recent United States Supreme Court case of *Commonwealth Coatings Corp. v. Continental Casualty Co.* (1968) 393 U.S. 145 to hold that "even in the absence of any showing of actual, fraud, corruption or partiality [the statutory criteria] on the part of the

7

the statute relevant to our inquiry followed a 2001 amendment. (Stats. 2001, ch. 362, § 5.) It provides in part: "(a) In any arbitration pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall *disclose* all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including all of the following: [¶] (1) The existence of any ground specified in Section 170.1 for *disqualification* of a judge." (§ 1281.9, subd. (a); italics added.)

Unlike the parallel statutory and canonical tracks for judges, from the outset the legislature included both disqualification and disclosure rules in one statute. Other statutes in this area have followed suit. (See, e.g., §§ 1281.85 [combining disclosure and disqualification requirements]; 1286.2, subd. (a)(6) [failure "to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware"].) Section 1281.85 also directs the Judicial Council to adopt ethics standards for arbitrators. In carrying out the statutory mandate, the Council promulgated the Ethical Standards for Neutral Arbitrators in Contractual Arbitration, Standard 7 ("Standard 7"). Standard 7 deals with both disclosure and disqualification.

Although there is nothing inherently suspect about having both the disqualification and the disclosure rules in the same provisions, it appears the structure may have had the unintended consequence of blurring the different standards for arbitrator disqualification and the arbitrator's duty to disclose relevant facts. Whether in the judicial or arbitral forum, the events that trigger disclosure must be different than those for disqualification. Otherwise, instead of disclosure there will be only disqualification. The confusion is exacerbated by some sloppy statutory draftsmanship that, I believe, has contributed to the result the majority reaches today. Somewhat remarkably, the lack of clarity is caused primarily by three common words: "might," "could," and "would." "Might" is the past

---

third (neutral) arbitrator, his failure to disclose even sporadic but substantial business relationships with a party to the arbitration constituted legal cause for vacating the award." (*Johnston,* at pp. 841-842.) The *Johnston* court applied the federal rule and affirmed the trial court's order vacating the award. (*Id.* at p. 845.)

tense of "may" and connotes possibility or probability.  (Merriam-Webster Online Dict. (2016) <www.merriam-webster.com/dictionary/might> [as of Apr. 5, 2016].)  "Could" is the past tense of "can" and is used to suggest something that is of "less force or certainty."  (Merriam-Webster Online Dict. (2016) <www.merriam-webster.com/dictionary/could> [as of Apr. 5, 2016].)  "Would" is used more in terms of what is "going to happen or be done."  (Merriam-Webster Online Dict. (2016) <www.merriam-webster.com/dictionary/would> [as of Apr. 5, 2016].)  Briefly, both "might" and "could" express less certainty of occurrence than "would."

Reviewing the arbitration statutes and Standard 7, one finds the use of all three words.  For example, in section 1281.9, the arbitrator "shall disclose all matters that *could* cause a person aware of the facts to reasonably entertain a doubt."  (Italics added.)  The statute proceeds to incorporate section 170.1, which as we have seen uses the phrase, "[a] person aware of the facts *might* reasonably entertain."  (Italics added.)  Standard 7 arguably worsens the problem.

Subdivision (d) of Standard 7 and the ensuing Comment state that an arbitrator must disclose all matters "that *could* cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial."  (Italics added.)  In subdivision (d)(1), the standard replaces "could" with "might."  "Would," on the other hand is used pretty uniformly throughout to describe the judge's likely ability to be impartial, not the state of mind of the litigant that triggers disclosure.

Even appellate courts have substituted one standard for another.  For example in *Haworth*, the Supreme Court was applying an earlier Court of Appeal decision to the facts before it:  " 'An impression of possible bias in the arbitration context means that one ***could*** reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason.  (Betz v. Pankow* [(1995) 31 Cal.App.4th 1503, 1511].)  Ossakow contends, and the Court of Appeal held, that Judge Gordon's public censure ***would*** cause a person to reasonably conclude that this arbitrator might be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery.' "  (*Haworth, supra,* 50 Cal.4th at p. 389; bolded italics added.)  Similarly, in *Benjamin Weill*, *supra*, the court

9

reversed the two tests in section 1281.9, subdivision (a)(1) when it stated: "The *Haworth* court rejected the argument that the censure *would* cause a person to reasonably conclude the arbitrator *might* be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery." (*Benjamin Weill, supra,* 195 Cal.App.4th at p. 64, italics added.) Respectfully, the two italicized words should have been interchanged.

E.       *Disclosure Must Be Broader Than Disqualification*

This brings me to the majority opinion, which also appears to use the "would" test to describe the belief of the interested party. "We fail to see how this would cause a person to reasonably entertain a doubt that Rolston would be able to be impartial to a client." (Maj. opn., at p. 8.) Instead of stating that it failed to see how this *would* cause a person to reasonably entertain a doubt about the arbitrator's impartiality, the majority, I suggest, should have used the broader terms "could" under section 1281.9 or "might" pursuant to section 170.1.

This rather lengthy exegesis of short words is not the mere meanderings of a hypertechnical wordsmith, but reflects what I believe to be a significant departure from the standards that govern arbitral disclosure.

Section 1281.9 must be read in context with its companion provisions. (*People v. Eribarne* (2004) 124 Cal.App.4th 1463, 1467.) Section 1281.85 provides that the Ethical Standards for Arbitrators must "address the disclosure of interests, relationships, or affiliations that *may* constitute conflicts of interest. (§ 1281.85, subd. (a) (italics added).) Once a proposed neutral arbitrator submits his section 1281.9 disclosure statement, he "shall be disqualified on the basis of the disclosure statement" if a party serves a notice of disqualification within 15 days. (§ 1281.91, subd. (b)(1).) "A party shall have the right to disqualify one court-appointed arbitrator without cause in any single arbitration, and may petition the court to disqualify a subsequent appointee only upon a showing of cause." (§ 1281.92, subd. (b)(2).)

As I read these provisions, parties to an arbitration have the right to disclosure of information that may (might) amount to a conflict of interest in order to protect their rights to disqualify a proposed arbitrator whose impartiality they doubt. In order to

10

effectuate that right, the disclosure standards must be read in light of section 1281.85, subdivision (a), which frames disclosure in terms of information that *may* constitute a conflict of interest.

I am inclined to believe that arbitrator Rolston's practice emphasis on law firm matters could cause a reasonable person to doubt his impartiality in a client versus law firm dispute. Regardless, that fact – the nature of his law practice – is not unconnected from the issue of whether his client base might cast doubt on his impartiality as it did in *Benjamin Weill, supra,* 195 Cal.App.4th 40. Instead, it is a fact that a reasonable party engaged in such a dispute might well wish to consider when deciding whether to accept a proposed neutral arbitrator or exercise his rights to disqualify that person.

As noted, the majority has framed the test in terms of information that would cause a reasonable person to doubt a proposed arbitrator's impartiality. I believe this takes away from the parties their right to obtain relevant information about the proposed arbitrator and leaves it to the arbitrators to decide for themselves whether the nature of their law practice or other business relationships could cast doubt on their impartiality.

It appears that this potential for confusion may have been one of the forces that contributed to the Supreme Court's modification to canon 3E(2) on judicial disclosure. The amendment deleted the subjective judge's belief about the disclosure of information and replaced it with: [¶] "A judge shall disclose information that is reasonably relevant to the question of disqualification under Code of Civil Procedure section 170.1, even if the judge believes there is no actual basis for disqualification." Although our Supreme Court has concluded that disqualification and disclosure rules for arbitrators and judges are not coterminous, it is apparent that in interpreting the same language in 1281.9 and canon 3E(2) there is no reason for a different result. I suggest that a reasonable construction of sections 1281.9 and 1281.85 – one certainly consistent with their express

11

language – is that an arbitrator must "disclose information that is reasonably relevant to the question of disqualification."**7**

*Conclusion*

A.

Little doubt exists that full and complete disclosure of relevant information that bears on an arbitrator's potential disqualification is essential to the public perception that arbitration is a fair and just method of dispute resolution. An arbitrator who fails to disclose relevant information on disqualification is an arbitrator who will inevitably invite after-the-award claims of bias. This is particularly so under the current state of the law that compels consumers, employees and others to submit to arbitration on the basis of a standard and often complex agreement that is often times not bargained for at arms' length.

As one commentator has written:

"By providing all disclosures up front, arbitrators then place the parties in the best position to opt to disregard the conflicts or to use the knowledge to find a more suitable neutral. It follows therefore, that post-award challenges on grounds of arbitrator bias would be substantially reduced, thereby reinforcing the efficiency and finality of arbitration as a process. As Justice White observed in *Commonwealth Coatings*, 'it is far better for a potential conflict of interest "[to] to be disclosed at the outset" than for it to "come to light" after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award.' Emphasis on candidness at the forefront of arbitration by the chosen neutrals ensures the continued likelihood of a streamlined means of dispute resolution throughout. [¶] The best way to address issues of arbitrator bias, therefore, is to ensure that from the onset, arbitrators are required to openly and broadly disclose prior relationships and dealings that may overlap or intertwine with the pending arbitration." (Melworm, Biased; Prove It: Addressing Arbitrator Bias and the

---

**7** If my interpretation is wrong, I would strongly urge the Legislature to revisit this issue and clarify the breadth of the arbitration disclosure standards.

12

Merits of Implementing Broad Disclosure Standards, 22 Cardozo J. Int'l & Comp. L. 431, 470 (2014).)

B.

Our Supreme Court has recognized some of the fundamental differences between judges and arbitrators in the overall dispute resolution system that we have. (*Haworth supra,* 50 Cal.4th at pp. 392-393.) A judge must decide all cases in which he or she is not disqualified. (§ 170.) A judge is extremely limited in his or her extrajudicial activities. (Cal. Code Jud. Ethics, canon 4.) Unlike judges, arbitrators can accept a wide range of professional relationships. Arbitrators who are lawyers may continue to practice law. Judges cannot. (*Id.* at canon 4G.) Arbitrators are paid by the disputants; judges are not. But the standard for disclosing information that is reasonably relevant to potential disqualification should be identical even though the specific grounds for disqualification may differ from judge to arbitrator.

The *Haworth* court recognized as such when it refused to create a rule sought by appellant that arbitrator disclosure should be "broader than the standard applicable for judicial recusal." (*Haworth, supra,* 50 Cal.4th at p. 392.) "The language of both applicable statutes is virtually identical, and the judicial standard is explicitly made applicable to arbitrators." (*Ibid.*)

Using this standard, I find no doubt that information that Rolston's law practice was in large measure devoted to representing lawyers was "reasonably relevant" to the issue of disqualification. Because Rolston did not disclose this information, I would reverse the judgment and direct the trial court to grant the motion to vacate the arbitration award and deny the motion to confirm that award. (§ 1286.2, subd. (a)(6).)

RUBIN, J.

13